[No. B003702. Second Dist., Div. Seven. May 26, 1989.]

FIRST ENGLISH EVANGELICAL LUTHERAN CHURCH OF GLENDALE, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

1354

**COUNSEL**

Fadem, Berger & Norton and Michael M. Berger for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, Charles J. Moore, Deputy County Counsel, Hill, Farrer & Burrill, Jack R. White, Darlene B. Fisher and Dean E. Dennis for Defendants and Respondents.

John K. Van de Kamp, Attorney General, N. Gregory Taylor, Assistant Attorney General, Craig C. Thompson and Terry T. Fujimoto, Deputy Attorneys General, as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**JOHNSON, J.**—In this opinion we consider an issue on remand from the United States Supreme Court. The high court held a landowner is entitled to compensation—not merely injunctive relief—when a court finds there has been an unconstitutional regulatory taking. But the Supreme Court expressly reserved the question whether respondent's regulatory action in this case amounted to an unconstitutional taking. We decide appellant failed to state a cause of action for two independent and sufficient reasons: (1) The interim ordinance in question substantially advanced the preeminent state interest in public safety and did not deny appellant all use of its property. (2) The interim ordinance only imposed a reasonable moratorium for a reasonable period of time while the respondent conducted a study and determined what uses, if any, were compatible with public safety.

### FACTS AND PROCEEDINGS BELOW

This is an action for property damage caused by the flooding of plaintiff's 21-acre private campground, Lutherglen, located at the bottom of a canyon in the Angeles National Forest, at 23200 Angeles Forest Highway, Palmdale, California.

Plaintiff, First English Evangelical Lutheran Church of Glendale (First English) purchased Lutherglen in 1957. Twelve acres are flat land, elevated a little above the banks of Mill Creek, a natural watercourse running down the canyon through Lutherglen, and emptying approximately 10 miles below into the Big Tujunga Dam. On this part of the property, First English built a dining hall, two bunkhouses, a caretaker's lodge, an outdoor chapel, and a footbridge across Mill Creek.

The middle fork of Mill Creek (Middle Fork) is the natural drainage channel for the watershed area owned by the National Forest Service (Forest Service) upstream of Lutherglen. The Middle Fork joins Mill Creek about 1-1/2 miles above Lutherglen, just below the point where the Angeles Forest Highway (highway) crosses the Middle Fork at Mileage Marker 16.56 (M.M. 16.56). The highway, built by defendant County of Los Angeles (County) with Forest Service approval, crosses the Middle Fork at about 20 locations in the canyon. At M.M. 16.56, the Middle Fork flows beneath the highway through two metal culverts placed by the County in the highway's solid raised-dirt embankment.

About 3,860 acres of the watershed area were burned in a fire known as the Middle Fire in July 1977. It is undisputed that the Middle Fire created a potential flood hazard.[1]

On February 9 and 10, 1978, a disaster waiting to happen finally arrived. A storm dropped a total of 11 inches of water in the watershed area. A giant wall of water rushed toward the fragile structures people had erected on the banks of the creek. The docile, often dry creek became a raging river and overflowed the banks of the Middle Fork and Mill Creek. The highway's culverts at M.M. 16.56 were inadequate to handle the volume of water.[2] The flood drowned 10 people in its path, swept away bridges and buildings, and inflicted millions of dollars in losses. Fortuitously, Lutherglen's planned camp for handicapped children scheduled for that week had been postponed. So no lives were lost on its property when the surging waters engulfed Lutherglen and destroyed its buildings.

Plaintiff filed this inverse condemnation action against the County and the Los Angeles County Flood Control District (District), claiming that the damage to Lutherglen constituted a taking without payment of compensation contrary to article I, section 19 of the California Constitution.[3] The first cause of action alleges that (1) the defendants are liable under Government Code section 835[4] for controlling the Middle Fork and the highway at M.M. 16.56, which constituted a dangerous condition of public property; and (2) that a County ordinance adopted after the flood constituted an unconstitutional taking of property by prohibiting all use of Lutherglen's 21 acres. The second cause of action alleges that the District engaged in cloud seeding during the storm, for which it is liable in tort and inverse condemnation.

The trial court granted the following pretrial motions: (1) defendants' motion to strike the portion of the first cause of action for damages in

[1] The vegetation of a watershed area normally protects against flooding because the vegetation slows the flow of water, which can then percolate into the soil or be carried away by streams. When the vegetation is burned, however, there is no slowing of the flow, and the crust on the ground formed by the fire's intense heat prevents percolation of water into the soil. Additionally, the ash and debris from the fire increase the bulk of the flow, known as the bulking factor, which increases the erosion damage caused by the runoff.

[2] Mill Creek at Lutherglen had a capacity of about 6,000 cubic feet of water per second (cfs). During the storm, the peak runoff just below Lutherglen was 8,800 cfs, 6,100 cfs of which came from Middle Fork and 2,700 cfs of which came from Mill Creek. Normally, had the watershed area not been burned, the flow from Mill Creek would have exceeded the flow from Middle Fork. Approximately 380,000 cubic yards of debris and sediment were carried by the runoff from the watershed area. About 12,000 cubic yards were deposited behind the highway at M.M. 16.56, about 38,000 cubic yards were deposited in Lutherglen, and the rest was deposited at Hansen Dam.

[3] All references concerning the complaint refer to the second amended complaint for inverse condemnation filed on January 5, 1981.

[4] Hereafter all section references are to the Government Code unless otherwise indicated.

inverse condemnation based on the taking of all use of Lutherglen by a County ordinance; (2) the District's motion for judgment on the pleadings on the second cause of action in tort and inverse condemnation based on cloud seeding; and (3) defendants' motion to limit the trial to the first cause of action for damages under section 835, rather than in inverse condemnation.

The trial, which proceeded solely on the section 835 action, was bifurcated and liability was tried to a jury prior to damages. At the close of plaintiff's evidence on liability, the court granted defendants' motion for nonsuit. A judgment of nonsuit dismissing the entire complaint was entered. In its initial appeal to this court, First English appealed the judgment of dismissal and also sought appellate review of the pretrial rulings enumerated above, and of the postjudgment order awarding costs and fees to defendants.

In an unpublished opinion authored by Justice Thompson, this court affirmed the nonsuit of the section 835 cause of action but reversed the dismissal of the claim of inverse condemnation based on the County's cloud seeding efforts. As to the "regulatory taking" cause of action based on the interim County ordinance prohibiting First English from rebuilding the destroyed buildings, Justice Thompson wrote: "We conclude that because the United States Supreme Court has not yet ruled on the question of whether a state may constitutionally limit the remedy for a taking to nonmonetary relief, this court is obligated to follow *Agins*. (*Auto Equity Sales, Inc.* v. *Superior Court* (1982) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)" (*First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles et al.* (June 25, 1985) B003702.)[5]

The California Supreme Court adhering to its own precedent in *Agins* v. *Tiburon* denied review on the "regulatory taking" as well as all other issues raised in the initial appeal. But the United States Supreme Court seized upon the case to finally resolve the remedy issue, a question it had been unable to reach for procedural reasons in a series of prior appeals.[6] The

---

[5] In *Agins* v. *Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25], affirmed on other grounds (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138], the California Supreme Court held a property owner was not entitled to monetary damages unless and until a court ruled a land use regulation was excessive and the government nevertheless chose to continue it in effect.

[6] "Four times this decade, we have considered similar claims and have found ourselves for one reason or another unable to consider the merits of the *Agins* rule. See *MacDonald, Sommer & Frates* v. *Yolo County,* 477 U.S. 340 (1986) [91 L.Ed.2d 285, 106 S.Ct. 2561]; *Williamson County Regional Planning Comm'n.* v. *Hamilton Bank,* 473 U.S. 172 (1985) [87 L.Ed.2d 126, 105 S.Ct. 3108]; *San Diego Gas & Electric Co.* [v. *San Diego* (1981) 450 U.S. 621 (67 L.Ed.2d 551, 101 S.Ct. 1287)]; *Agins* v. *Tiburon, supra.*" (*First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 310 [96 L.Ed.2d 250, 261, 107 S.Ct. 2378].)

Supreme Court limited its grant of certiorari to our ruling on the "regulatory taking" cause of action. In a 6-3 decision the high court reversed our resolution of this issue. The majority held we were in error because we relied on an erroneous ruling of the California Supreme Court in *Agins*. The Supreme Court held monetary damages indeed can be sought as an initial remedy for "inverse condemnation" claims based on unconstitutional "regulatory takings." (*First Lutheran Church* v. *Los Angeles County, supra,* 482 U.S. at p. 321 [96 L.Ed.2d at pp. 267-268].) However, the Court limited its decision to this single issue and remanded the case to our court to determine whether the County's ordinance actually represents an unconstitutional "taking" of appellant's property without compensation. (*Id.* at pp. 313, 321, 322 [96 L.Ed.2d at pp. 262-263, 267-268].)

## DISCUSSION

Our own previous opinion and that of the Supreme Court define what it is we have yet to resolve in the instant opinion. The trial court made its order striking the inverse condemnation conversion allegation based on the California Supreme Court ruling that damages are not available for a "regulatory taking" until after the regulation in fact is ruled to be an unconstitutional taking and the government elects to continue the regulation in effect. This ground for the order has been overturned. We must now decide whether this order can be sustained on any other grounds. ■ For, it is well settled that a trial court's decision is not to be reversed merely because it was based on erroneous grounds if there is an alternative rationale which will support that judgment. (*Keenan* v. *Dean* (1955) 134 Cal.App.2d 189 [285 P.2d 300] [appellate court can uphold motion to strike granted on erroneous grounds if demurrer could have been sustained for failure to state cause of action].)

The United States Supreme Court in *First Lutheran Church* made it abundantly clear the Court was deciding the remedies issue—and only that issue.[7] The majority specifically held it was not deciding appellant had

---

[7] *First Lutheran Church* and another land use case decided the same term—*Nollan* v. *California Coastal Commission* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141]—have engendered enormous interest in the academic community. (See, e.g., Horder, *Where Is the Supreme Court Heading in Its Taking Analysis and What Impact Will This Direction Have on Municipalities?* (1988) 28 Nat. Resources J. 585; Geraci & Nabozny-Younger, *Damages for a Temporary Regulatory Taking: First English Evangelical Lutheran Church v. County of Los Angeles* (1988) 24 Cal. West. L.Rev. 33; Williams, *Legal Discourse, Social Vision and the Supreme Court's Land Use Planning Law: The Genealogy of the Lochnerian Recurrence in First English Church and Nollan* (1988) 59 U. Colo. L.Rev. 427; Berger, *Happy Birthday, Constitution: The Supreme Court Establishes New Ground Rules for Land-Use Planning* (1988) 20 Urban L. 735; Large, *The Supreme Court and the Takings Clause: The Search for a Better Rule* (1987) 18 Envtl. L. 3; Falik & Shimko, *The "Takings" Nexus—The Supreme Court Chooses a New Direction in Land-Use Planning: A View from California* (1988) 39 Hastings

stated a cause of action. As Chief Justice Rehnquist wrote: "In affirming the decision to strike this allegation, the Court of Appeal [this court] assumed that the complaint sought 'damages for the uncompensated *taking* of all use of Lutherglen by County Ordinance No. 11,855.'. . .It relied on the California Supreme Court's *Agins* decision for the conclusion that 'the remedy for a *taking* [is limited] to nonmonetary relief. . . .'. . . .The disposition of the case on these grounds isolates the remedial question for our consideration. The rejection of appellant's allegations did not rest on the view that they were false. . . . Nor did the court rely on the theory that regulatory measures such as Ordinance No. 11,855 may never constitute a taking in the constitutional sense. Instead, the claims were deemed irrelevant solely because of the California Supreme Court's decision in *Agins* that damages are unavailable to redress a 'temporary' regulatory taking. . . .

"We reject appellee's suggestions that, regardless of the state court's treatment of the question, we must independently evaluate the adequacy of the complaint and resolve the takings claim on the merits before we can reach the remedial question. . . .We accordingly have no occasion to decide whether the ordinance at issue actually denied appellant all use of its property or whether the county might avoid the conclusion that a compensable taking had occurred by establishing that the denial of all use was insulated as a part of the State's authority to enact safety regulations. (Citations omitted.) *These questions, of course, remain open for decision* on the remand we direct today." (Italics added.) (*First Lutheran Church* v. *Los Angeles County, supra,* 482 U.S. at pp. 311-313 [96 L.Ed.2d at pp. 261-263].)

The very limited nature of the court's holding was underscored in a portion of the dissenting opinion which was not controverted in any way in the majority opinion. As Justice Stephens wrote in his dissenting opinion for three members of the court: "The Court of Appeal affirmed on the authority

L.J. 359; Siemon and Larsen, *The Taking Issue Trilogy: The Beginning of the End?* (1988) 33 Wash. U.J. Urb. & Contemp. L. 169; Acton, *Much Ado About Nollan: The Supreme Court Addresses the Complex Network of Property Rights, Land Use Regulations, and Just Compensation in the Keystone, Nollan, and First English Cases* (1988) 17 Stetson L.Rev. 727; Woodard, *Constitutional Law: Is Time Running Out for the Government to Dispute Regulatory Takings?* (1988) 10 Campbell L.Rev. 275; Patton, *Affirmative Relief for Temporary Regulatory Takings* (1987) 48 U. Pitt. L.Rev. 1215; Johnson, *Compensation of Landowners for Temporary Regulatory Takings* (1987) 21 Ga.L.Rev. 1169; Lodise, *Retroactive Compensation and the Illusion of Economic Efficiency: An Analysis of the First English Decision* (1988) 35 UCLA L.Rev. 1267; Falik & Shimko, *The Takings Nexus: The Supreme Court Forges a New Direction in Land-Use Jurisprudence* (1988) 23 Real Prop., Prob. & Tr. J. 1; Batchelder, *Flood Plain Zoning in California—Open Space by Another Name: Policy and Practicality* (1973) 10 San Diego L.Rev. 381.)

of *Agins* alone, . . . without holding that the complaint had alleged a violation of either the California Constitution or the Federal Constitution. At most, it assumed, *arguendo,* that a constitutional violation had been alleged.

"This Court clearly has the authority to decide this case by ruling that the complaint did not allege a taking under the Federal Constitution, and therefore to avoid the novel constitutional issue that it addresses. Even though I believe the Court's lack of self-restraint is imprudent, it is imperative to stress that the Court does not hold that appellant is entitled to compensation as a result of the flood protection regulation that the county enacted. No matter whether the regulation is treated as one that deprives appellant of its property on a permanent or temporary basis, this Court's precedents demonstrate that the type of regulatory program at issue here cannot constitute a taking.

"[A]lthough the Court uses the allegations of this complaint as a springboard for its discussion of a discrete legal issue, it does not, and could not under our precedents, hold that the allegations sufficiently alleged a taking or that the county's effort to preserve life and property could ever constitute a taking. As far as the United States Constitution is concerned, the claim that the ordinance was a taking of Lutherglen should be summarily rejected on its merits." (*First Lutheran Church* v. *Los Angeles County, supra,* 482 U.S. at pp. 324-325, 328 [96 L.Ed.2d at pp. 270, 272], Stevens, J., dis.)

This brings us to the question whether the substantive allegations of the "regulatory taking" claim state a valid cause of action. The answer to this question, in turn, depends upon whether the public is justified in placing the burden of these restrictions on this private landowner rather than compensating the landowner for the uses it is required to give up. Commentators have noted the law is not well-settled in this area. (See, e.g., Siemon & Larson, *The Taking Issue Trilogy: The Beginning of the End?, supra,* 33 Wash. Univ. J. of Urban & Contemporary L. 169.) Nevertheless, there are enough guideposts to resolve the instant case. It simply does not pose a close issue under any formulation the Supreme Court has suggested as the appropriate test for judging when compensation is required.

I. *The "Public Safety Exception" and Other Governmental Restrictions on the Use of Private Property*

Earlier we quoted Chief Justice Rehnquist's majority opinion in *First Lutheran Church* where he raised the possibility "the denial of all use was insulated [from compensation] as a part of the State's authority to enact

safety regulations." One of the cases the Chief Justice mentioned in support of that proposition was the seminal decision, *Mugler* v. *Kansas* (1887) 123 U.S. 623 [31 L.Ed. 205, 8 S.Ct. 273]. In that case, an owner of a brewery challenged a newly enacted state liquor prohibition law on grounds it constituted a taking of his property rights without compensation because it denied him use of his property. The Supreme Court in an opinion by Justice Harlan held this was not a compensable taking but rather a proper exercise of the state government's "police powers." "Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine, primarily, what measures are appropriate, or needful for the protection of the public morals, the public health or the public safety.

"Undoubtedly the State, when providing by legislation for the protection of the public health, the public morals, or the public safety, is subject to the paramount authority of the Constitution of the United States, and may not violate rights secured or guaranteed by that instrument, or interfere with the execution of the powers confided to the government. [Citations omitted.] Upon this ground . . . defendants . . . [contend] that, as their respective breweries were erected when it was lawful to engage in the manufacture of beer for every purpose; as such establishment will become of no value as property, or, at least, will be materially diminished in value, if not employed in the manufacture of beer for every purpose; the prohibition upon their being so employed is, in effect, a taking of property for public use without compensation, and depriving the citizen of his property without due process of law.

"This interpretation of the Fourteenth Amendment is inadmissible. It cannot be supposed that the states intended, by adopting that Amendment, to impose restraints upon the exercise of their powers for the protection of the safety, health, or morals of the community. . . [A]ll property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community. [Citations omitted.]" (123 U.S. at pp. 660-665 [31 L.Ed.2d at pp. 210-211].)

The *Mugler* court distinguished *Pumpelly* v. *Green Bay Company* (1872) 80 U.S. (13 Wall.) 166 [20 L.Ed. 557]. In that case the Supreme Court had held the state was required to compensate a property owner whose land was completely flooded when the government erected a dam across a river. "[*Pumpelly*] was a case in which there was a 'permanent flooding of private property,' a 'physical invasion of the real estate of the private owner, and a practical ouster of his possession.' His property was, in effect, required to be

devoted to the use of the public, and, consequently, he was entitled to compensation." (123 U.S. at p. 668 [31 L.Ed. at p. 213].)

Erecting a dam which permanently submerges a property owner's land under a lake is one thing, a law limiting his use of that land quite another. ■ As the *Mugler* court ruled: "A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by anyone, for certain forbidden purposes, is prejudicial to the public interest. Nor can legislation of that character come within the Fourteenth Amendment, . . . unless it is apparent that its real object is not to protect the community, or to promote the general well being, but, under the guise of police regulation, to deprive the owner of his liberty and property, without due process of law. *The power which the states have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted . . . to inflict injury upon the community.*" (123 U.S. at pp. 668-669 [31 L.Ed. at p. 213], italics added.)

■ We recognize a brewery is a far cry from a Bible camp. But here the threat to public health and safety emanates not from what is produced on the property but from the presence of any substantial structures on that property. The principles enunciated in *Mugler* have been applied by the court to uphold prohibitions against a broad range of other uses of one's property—e.g., an ordinance prohibiting the manufacture of bricks inside the city limits of Los Angeles (*Hadacheck* v. *Sebastian* (1915) 239 U.S. 394 [60 L.Ed. 348, 36 S.Ct. 143]); a requirement property owners cut down red cedars which were infected with a communicable plant disease fatal to neighboring apple orchards (*Miller* v. *Schoene* (1928) 276 U.S. 272 [72 L.Ed. 568, 48 S.Ct. 246]); and a prohibition against excavating below the water table in order to extract gravel (*Goldblatt* v. *Town of Hempstead* (1962) 369 U.S. 590 [8 L.Ed.2d 130, 82 S.Ct. 987]).

Sometimes government exercises its police powers through the enactment of zoning ordinances and other forms of land use regulation. Whether a specific regulation represents an unconstitutional "taking" involves the same considerations as suggested in *Mugler* and its progeny.

Recently, in *Agins* v. *Tiburon* (1980) 447 U.S. 255 [157 Cal.Rptr. 372, 598 P.2d 25], Justice Powell writing for a unanimous court gathered the strands of earlier cases[8] and articulated the test which the high court now invokes in zoning cases. ■ "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests [citation omitted] or denies an owner economically viable use of his land [citation omitted].[9] The determination

---

[8] The first Supreme Court case to address the constitutionality of municipal zoning itself was *Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016] which upheld the validity of this form of land use regulation by analogy to the government's power to regulate public nuisances on private property. It is noteworthy this case was written in the heyday of "substantive due process" when the Supreme Court freely struck down many other regulatory laws. Indeed *Euclid* v. *Ambler* was authored by one of the chief exponents of "substantive due process," Justice Sutherland. The next few years saw a number of cases accepting the constitutionality of land use regulation (*Zahn* v. *Board of Public Works* (1927) 274 U.S. 325 [71 L.Ed. 1074, 47 S.Ct. 594]; *Gorieb* v. *Fox* (1927) 274 U.S. 603 [71 L.Ed. 1228, 47 S.Ct. 675, 53 A.L.R. 1210]) although two opinions of that era disapproved specific provisions not remotely resembling the instant ordinance and its public safety concerns (*Nectow* v. *City of Cambridge* (1928) 277 U.S. 183 [72 L.Ed. 842, 48 S.Ct. 447]; *Washington* ex rel. *Seattle Title Trust Co.* v. *Roberge* (1928) 278 U.S. 116 [73 L.Ed. 210, 49 S.Ct. 50, 86 A.L.R. 654]).

[9] The essence of this test was set forth in 1922 when the court denied relief to a homeowner whose house was threatened with damage because of a coal mining operation beneath his property. (*Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393 [67 L.Ed. 322, 43 S.Ct. 158, 28 A.L.R. 1321].) The majority opinion by Justice Holmes held a newly enacted "subsidence" law amounted to an unconstitutional taking of the mineowners' entire "surface support" property interest, an interest the landowners above had sold them previously. Although Justice Holmes did not use the precise words the court subsequently set forth as a test in *Agins,* a later opinion pointed out he was talking about the same factors—the public interest the regulation advances and the degree of the taking. (*Keystone Bituminous Coal Assn.* v. *De Benedictis* (1987) 480 U.S. 470, 485 [94 L.Ed.2d 472, 488, 107 S.Ct. 1232].) Notably, as the Supreme Court pointed out in that same opinion, Justice Holmes did not contest the main legal premise of Justice Brandeis's dissent—government has an absolute right to prohibit land uses which constitute a public nuisance. Instead Justice Holmes attacked the minor premise. (480 U.S. at p. 488, fn. 17 [94 L.Ed.2d at p. 490], citing 260 U.S. at pp. 413-414, 417 [67 L.Ed. at pp. 325, 326-327].) He found the particular statute involved was not a legitimate exercise of the police power but only a "private benefit" statute which shifted economic benefits from individual mineowners to individual building owners. "A source of damage to such a house is not a public nuisance. . . . Furthermore, [*the statute*] *is not justified as a protection of personal safety.* That could be provided for by notice." (260 U.S. at pp. 413-414 [67 L.Ed. at p. 325], italics added.) Justice Holmes then shifted to the other factor and found "the extent of the taking is great. It purports to abolish what is recognized in Pennsylvania as an estate in land—a very valuable estate—and what is . . . a contract . . . binding on the [homeowner]." (*Ibid.*)

In *Keystone Bituminous Coal* the Supreme Court distinguished Justice Holmes's majority opinion in *Pennsylvania Coal* and upheld a similar "subsidence" statute by emphasizing the Legislature enacted the new law to advance the "health, safety and general welfare" of the public instead of "merely . . . balancing . . . the private economic interests of coal companies against the private interests of the surface owners." (*Keystone Bituminous Coal Assn.* v. *De Benedictis, supra,* 480 U.S. at pp. 485-492 [94 L.Ed.2d at pp. 488-493].) The court also looked to the second factor of the *Agins* test and found that in any event the "subsidence"

that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest. Although no precise rule determines when property has been taken [citation omitted] the question necessarily requires a weighing of private and public interests. . . . Appellants [in the *Agins* case]. . . will share with other owners the benefit and burdens of the city's exercise of its police power. In assessing the fairness of the zoning ordinances, these benefits must be considered along with any diminution in market value that appellants may suffer." (447 U.S. at pp. 260-262 [65 L.Ed.2d at pp. 112, 113].)

In *Agins,* the Supreme Court was called upon to apply this test to a zoning ordinance which limited landowners to one residence on each acre of land. The court found the prevention of premature urbanization was a "legitimate state interest" and a limitation of one dwelling per acre "substantially advanced" this interest. It further found the landowner shared in these public benefits which helped offset any diminution of market value he might suffer. Accordingly, the regulation imposing the limitation was not an unconstitutional "taking" of the landowner's property and the landowner was not entitled to compensation.

In a case decided the same term as *First Lutheran Church* the Supreme Court applied this same basic test to strike down a condition the California Coastal Commission imposed on an owner of beachfront property (*Nollan v. California Coastal Commission, supra,* 483 U.S. 825). This condition required the owner to grant an easement allowing public access to the beach in front of his home. The Supreme Court added a refinement to the test. The government's regulation—in this case, a condition—must substantially advance the precise state interest which avowedly motivated the regulation. The *Nollan* majority found the condition imposed—an easement affording *physical* access to the beach—did not substantially advance the avowed purpose of enhancing *visual* access to the beach.

II. *First English Is Not Entitled to Compensation Because the Interim Ordinance Did Not Deprive It of "All Uses" of Lutherglen and Whatever Uses Were Denied Were Properly Denied to Preserve Public Safety*

One pair of commentators suggests the Supreme Court has held a private landowner is entitled to compensation when a land use regulation *either*

statute did not represent a taking of "all use" since the mineowners could still take out substantial amounts of coal without disturbing the surface.

For reasons discussed in the next section, the instant case resembles *Keystone Bituminous Coal* much more than it does *Pennsylvania Coal.* However, here the public safety concerns are far more dominant than they are even in *Keystone Bituminous Coal.*

does not substantially advance a legitimate public purpose *or* deprives the landowner of "all uses" of the property. (Falik and Shimko, *The Takings Nexus: The Supreme Court Forges a New Direction in Land-Use Jurisprudence, supra,* 23 Real Property, Probate & Trust J. 1.) To put it another way, they construe the Supreme Court's decision in *Agins* v. *Tiburon, supra,* to mean landowners are entitled to compensation if the land use regulation deprives them of "all uses" of the property even if the regulation involved substantially advances a legitimate public purpose. They admit there is conflict between this "either/or" test and some of the crucial language in Chief Justice Rehnquist's majority opinion in *First Lutheran Church.* There, as will be recalled, the Supreme Court majority clearly stated the land use regulation involved in this case—interim ordinance No. 11,855— would *not* constitute a compensable "taking" if the regulation did not deprive First English of "all uses" of its property *or* even assuming it prohibited "all uses" of that property if that deprivation of "all uses" promoted public safety. Under this formulation First English would not be entitled to compensation even if interim ordinance No. 11,855 deprived it of "all uses" of Lutherglen if that prohibition substantially advances the interest in public health and safety.

If necessary, we could readily reconcile the *Agins* formulation and the *First Lutheran Church* formulation. In *Agins* the public purpose advanced was the interest in preventing premature urbanization (with premature urbanization defined as development in excess of one home per acre). The Supreme Court might have difficulty finding that this public purpose would justify depriving a landowner of "*all* use" of his property. However, the Supreme Court recognized the public purpose in *First Lutheran Church* is far different—the preservation of lives and health. It would not be remarkable at all to allow government to deny a private owner "all uses" of his property where there is no use of that property which does not threaten lives and health. So it makes perfect sense to deny compensation for the denial of "all uses" where health and safety are at stake but require compensation for the denial of "all uses" where the land use regulation advances lesser public purposes. Indeed it would be extraordinary to construe the Constitution to require a government to compensate private landowners because it denied them "the right" to use property which cannot be used without risking injury and death.[10]

---

[10] This reconciliation of the two formulations finds considerable support in another opinion filed during the same term as *First Lutheran Church*—*Keystone Bituminous Coal Assoc.* v. *De Benedictis, supra,* 480 U.S. 470. "Many cases . . . have recognized that the nature of the State's action is critical in takings analysis. [Fn. omitted.] . . . The Court's hesitance to find a taking when the state merely restrains uses of property that are tantamount to public nuisances is consistent with the notion of 'reciprocity of advantage' that Justice Holmes referred to in *Pennsylvania Coal.* . . .[O]ne of the State's primary ways of preserving the public weal

■ We need not choose between the *Agins* and *First Lutheran Church* formulations of the test, however. Interim ordinance No. 11,855 survives under either formulation. It did not deny First English "all use" of the property and the uses it did deny could be constitutionally prohibited under the County's power to protect public safety.

True, the complaint *alleges* interim ordinance No. 11,855 denies First English "all use" of Lutherglen. But as will be seen shortly, the ordinance *does not* deny First English "all use" of this property. It does not even prevent occupancy and use of any structures which may have survived the flood. It only prohibits the reconstruction of structures which were demolished or damaged by the raging waters and the construction of new structures. In no sense does it prohibit uses of this campground property which can be carried out without the reconstruction of demolished buildings or the erection of new ones. First English's complaint stated solely a facial challenge to the interim ordinance and *as far as this ordinance itself was concerned,* many camping activities could continue on this property. Meals could be cooked, games played, lessons given, tents pitched. (If Lutherglen had been a factory or a coal mine, these sorts of uses would have meant little to the landowner. But Lutherglen is a camping facility. So uses of value to that purpose remained available during the time the interim ordinance was in effect.)

Given the serious safety concerns demonstrated by the February 1978 flood, the County might well have been justified in prohibiting entirely any human occupancy or other use whatsoever of Lutherglen until it had completed a thorough study and determined precisely what, if any, occupancy and uses were compatible with the public safety. ■ However, we need not address that issue in this case since interim ordinance No. 11,855 did *not* by its terms preclude "all uses" of this property.

The issue actually raised is whether the County could constitutionally do what it did in interim ordinance No. 11,855—prevent the construction of any buildings in Lutherglen on an interim basis. It is to this issue we now turn.

To properly apply the constitutional test to respondents' regulatory action in this case requires that we take a closer look at the interim flood

is restricting the uses individuals can make of their property. While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others. . . .[T]he Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it. . . . As the cases . . . demonstrate, the public interest in preventing activities similar to public nuisances is a substantial one, which in many instances has not required compensation." (480 U.S. at pp. 488-489, 491, 492 [94 L.Ed.2d at pp. 490, 492].) As we do in the instant case, however, the Supreme Court found it unnecessary to rest its decision solely on this ground since the mineowners retained some uses of their property.

control ordinance itself as well as other relevant land use provisions. We are reviewing a judgment on the pleadings and ordinarily would be confined to the allegations of the complaint. However, an appellate court is allowed to take account of matters which can be judicially noticed (Code Civ. Proc., § 430.30, subd. (a); *Dryden v. Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 997 [135 Cal.Rptr. 720]; 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, §§ 394, 395; 5 Witkin, Cal. Procedure, *supra,* § 896.) This includes legislative acts and enactments (*People v. Oakland Water Front Co.* (1897) 118 Cal. 234, 245 [50 P. 305]; *Livermore v. Beal* (1937) 18 Cal.App.2d 535 [64 P.2d 987]; 4 Witkin, Cal. Procedure, *supra,* § 395). ■ We have taken judicial notice of the disputed interim ordinance, County ordinance No. 11,855, the subsequent permanent flood control ordinance, and a variety of other County ordinances bearing on this particular property.

First English's camp, Lutherglen, is located in an area which was and is zoned "R-R" (Resort and Recreation). A youth camp such as this is allowed within this zone only pursuant to a "Conditional Use Permit." At the time of the flood, the camp grounds included two bunk houses, a dining hall, a caretaker's lodge, and an outdoor chapel. After the February 1978 flood swept away most of these structures and those of other camps in the Mill Creek flood way, the County adopted County ordinance No. 11,855 as an interim measure. This ordinance was enacted on January 11, 1979, and provides in pertinent part: "A person shall not construct, reconstruct, place or enlarge any building or structure, any portion of which is, or will be, located within the outer boundary lines of the interim flood protection area located in Mill Creek Canyon, vicinity of Hidden Springs, . . .

"Studies are now under way by the Department of Regional Planning in connection with the County Engineer and the Los Angeles County Flood Control District, to develop permanent flood protection areas for Mill Creek and other specific areas as part of a comprehensive flood plain management project. Mapping and evaluation of flood data has progressed to the point where an interim flood protection area in Mill Creek can be designated. Development is now occurring which will encroach within the limits of the permanent flood protection area *and which will be incompatible with the anticipated uses to be permitted within the permanent flood protection area*. If this ordinance does not take immediate effect, said uses will be established prior to the contemplated ordinance amendment, and once established may continue after such amendment has been made [because of the 'grandfather' provisions of the zoning code]." (Italics in original.)

By its terms, this ordinance temporarily prohibited appellant from rebuilding the structures lost to the February 1978 flood while the County

studied what permanent measures it would have to take to prevent a recurrence of that deadly event. The interim ordinance did not affect eight of the twenty-one acres on the Lutherglen site because they were not in the flat land near the river channel.

Appellant's "regulatory taking" cause of action was predicated solely on this temporary interim ordinance. Nor has First English ever amended its complaint to allege the permanent flood control ordinance enacted in 1981 constituted a "taking" of its property. Nonetheless, it is helpful to an understanding of the temporary measure to consider the terms of the permanent ordinance.

On November 8, 1980—22 months after the interim ordinance went into effect and 21 months after First English filed its lawsuit—the Los Angeles County Regional Planning Commission issued a report on a proposed permanent flood protection district encompassing the Mill Creek area. The commission found: ". . . [T]he subject property [restriction] represents one strategy in Los Angeles County's comprehensive program *to insure compliance with the requirements of the Federal Flood Protection Program by designation of a flood protection area along the stream bed of Mill Creek*; . . .[T]his will be accomplished by the prohibition of buildings and major structures within the area reserved for flood flows which includes both the existing wash or channel and additional area as may be necessary to provide reasonable protection from overflow of flood waters, bank erosion, and debris deposition; . . .[*A*]*ll affected parcels still will have buildable areas;* . . .Establishment of the proposed district at such location is in the interest of public health, safety, and general welfare. . . ." (Regional Planning Com., L.A. County, Flood Protection Case No. 3-(5) Nov. 8, 1980, italics added.)

Pursuant to the commission's findings and recommendations the board of supervisors enacted Ordinance No. 12,413. This ordinance, adopted August 11, 1981, created the Mill Creek Flood Protection District and superseded the interim flood-protection district of ordinance No. 11,855. The permanent building restriction encompasses the same area as the interim ordinance had. This permanent ordinance recites as its purpose: "The flood protection district is established as a supplemental district for regulation of property within areas designated by the Chief Engineer of the Los Angeles County Flood Control district as subject to substantial flood hazard. Such district includes both the existing wash or channel and additional area as necessary to provide reasonable protection from overflow of floodwaters, bank erosion, and debris deposition."

Among other things, the permanent ordinance prohibits construction or reconstruction of most buildings within the district. The exceptions, however, do permit "accessory building structures that will not substantially impede the flow of water, including sewer, gas, electrical, and water systems approved by the county engineer . . . [a]utomobile parking facilities incidental to a lawfully established use . . . [and] [f]lood control structures. . . ." (L.A. County Code, 22.44.220.) Another provision instructs the county engineer to "enforce, as a minimum, the current Federal flood plan management regulations" when considering whether to issue building permits for buildings or other structures in this flood control zone.

If there is a hierarchy of interests the police power serves—and both logic and prior cases suggest there is—then the preservation of life must rank at the top. Zoning restrictions seldom serve public interests so far up on the scale. More often these laws guard against things like "premature urbanization" (*Agins* v. *Tiburon, supra,* 447 U.S. 255), or "preserve open spaces" (*Morse* v. *County of San Luis Obispo* (1967) 247 Cal.App.2d 600 [55 Cal.Rptr. 710]), or contribute to orderly development and the mitigation of environmental impacts (see, e.g., *Euclid* v. *Ambler Realty Co., supra,* 272 U.S. 365; *Friends of Westwood* v. *City of Los Angeles* (1987) 191 Cal.App.3d 259 [235 Cal.Rptr. 788]). When land use regulations seek to advance what are deemed lesser interests such as aesthetic values of the community they frequently are outweighed by constitutional property rights (see, e.g., *Desert Outdoor Advertising* v. *County of San Bernardino* (1967) 255 Cal.App.2d 765 [63 Cal.Rptr. 543]). Nonetheless, it should be noted even these lesser public interests have been deemed sufficient to justify zoning which diminishes—without compensation—the value of individual properties. (Van Alstyne, *Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria* (1971) 44 So.Cal.L.Rev. 1, and cases cited therein.)

The zoning regulation challenged in the instant case involves this highest of public interests—the prevention of death and injury. Its enactment was prompted by the loss of life in an earlier flood. And its avowed purpose is to prevent the loss of lives in future floods. Moreover, the lives it seeks to save and the injuries it strives to prevent are not only those on other properties but on appellant's property as well.

We need not address the ultimate question—is the public interest at stake in this case so paramount that it would justify a law which prohibited *any* future occupancy or use of appellant's land. Certainly, the owners of red cedar trees were not entitled to any public compensation when the state required them to destroy those trees in order to save the "lives" of apple trees in *Miller* v. *Schoene, supra,* 276 U.S. 272. But the zoning limitation in

the instant case is nowhere near as draconian. Zoning for this property allowed several uses of Lutherglen throughout the term of the interim ordinance First English challenges. During that period and after enactment of the permanent ordinance, as well, this property could be used for "agricultural, and recreational uses." And under the permanent ordinance appellant First English is specifically allowed to build swimming pools, parking lots, and accessory buildings within the flood zone portion of its property. (Since First English does not allege it has been denied permits to build any alleged "accessory buildings" we cannot know the scope of this exception.) What First English can no longer do is rebuild the bunkhouses and similar permanent living structures which might house the potential victims of a future flood or if carried away by that flood cause death, injury and property damage to other properties further downstream.

We have no problem concluding these zoning restrictions represent a valid exercise of the police power and not an unconstitutional "taking without compensation." On balance, the public benefits this regulation confers far exceed the private costs it imposes on the individual property owner (especially after factoring in the public benefits this property owner shares). These are the considerations the Supreme Court deemed to control the decision whether government should be compelled to award compensation when its regulations drastically limit the uses of private property. (*Agins* v. *Tiburon, supra,* 447 U.S. 255, 260-262 [65 L.Ed.2d 106, 111-113], see discussion at pp. 1365, *ante*.) On one side of the scale the zoning restriction "substantially advances" the highest possible public interest—the prevention of death and injury both on and off appellant's property. On the other side of the scale, appellants and their future campers not only share in this public benefit but are still left with some permissible uses of the property. The fact the zoning restrictions necessary to the preservation of life and health may cause a diminution in the use and economic value of this property does not create an automatic legal entitlement to compensation for that loss of use and value. (*Goldblatt* v. *Town of Hempstead, supra,* 369 U.S. 590; *Hadachek* v. *Sebastian, supra,* 239 U.S. 394; see *Keystone* v. *De Benedictis, supra,* 480 U.S. 470.)

This case presents a dramatic illustration of the principle of "reciprocity of advantage." Lutherglen is one of several properties running along this riverbed. Those who use Lutherglen are endangered by any structures that may be built on these other properties, just as those using the other properties are endangered by structures First English might erect on Lutherglen. First English enjoys the safety benefits accompanying the prohibition of construction on the other properties along the riverbed in return for the

"reciprocal" safety benefits that flow to the other landowners because First English is subject to a similar ban.

The instant complaint contains no allegations controverting the legislative history nor does it present other facts we are entitled to judicially notice casting doubt on the avowed intent and effect of the interim ordinance. Indeed, after reciting the terms of the now-superseded ordinance the sole allegation is that "Ordinance No. 11,855 denies First Church all use of Lutherglen." The complaint does not allege the limitations imposed on First English's use of the property were motivated by a desire to acquire Lutherglen at a lower price or that it was unreasonable for the County to conclude these limitations would contribute substantially to the public safety.

█ The government is entitled to a presumption its regulations are motivated by and reasonably serve their avowed purposes (*Morse v. San Luis Obispo County, supra*, 247 Cal.App.2d 600) which can only be overcome by specific allegations and proof. █ In the instant case, it is abundantly clear from the interim ordinance and related judicially noticed facts that the avowed purpose of this ordinance was to protect lives and health. There can be no serious contention under *Nollan* that the regulation fails to "substantially advance" the precise "legitimate state interest" the County avows prompted the interim and permanent ordinances. Restricting the erection of structures in the flood zone along the river is calculated to substantially advance the state's legitimate interest in preventing injury and death during the next flood. Accordingly, we are satisfied that the instant complaint does not state a valid claim for a compensable taking. In the words of Chief Justice Rehnquist, the ordinance did not "actually [deny] appellant all use of its property" and in any event "the denial of all use was insulated as a part of the State's authority to enact safety regulations." (*First Lutheran Church v. Los Angeles Court, supra*, 482 U.S. at p. 313 [96 L.Ed.2d at p. 262].)

III. *The Interim Ordinance Is Further Justified as a Reasonable Temporary Limitation on Construction to Maintain the Status Quo While the County Determined What, if Any, Structures Were Compatible With Public Safety*

As an independent and sufficient ground for our decision, we further hold the interim ordinance did not constitute a "temporary unconstitutional taking" even were we to assume its restrictions were too broad if *permanently imposed* on First English. This interim ordinance was by design a

temporary measure—in effect a total moratorium on any construction on First English's property—while the County conducted a study to determine what uses and what structures, if any, could be permitted on this property consistent with considerations of safety. We do not read the United States Supreme Court's decision in *First Lutheran Church* as converting moratoriums and other interim land-use restrictions into unconstitutional "temporary takings" requiring compensation unless, perhaps, if these interim measures are unreasonable in purpose, duration or scope. On its face, ordinance No. 11,855 is reasonable in all these dimensions.

The ordinance had the legitimate avowed purpose of preserving the status quo while the County studied the problem and devised a permanent ordinance which would allow only safe uses and the construction of safe structures in and near the river bed. The restrictions in ordinance No. 11,855 were reasonably related to the achievement of this objective. Given the seriousness of the safety concerns raised by the presence of any structures on this property, we find it was entirely reasonable to ban the construction or reconstruction of any structures for the period necessary to conduct an extensive study and fully develop persuasive evidence about what, if any, structures and uses would be compatible with the preservation of life and health of future occupants of this property and other properties in this geographic area.

We do not find the ordinance remained in effect for an unreasonable period of time beyond that which would be justified to conduct the necessary studies of this situation and devise a suitable permanent ordinance. The study was completed and a report containing recommended restrictions submitted in less than two years. County decisionmakers took another six months to hold hearings, ponder and pass the somewhat less-restrictive permanent ordinance. These periods are reasonable especially given the complexity of the issues to be studied and resolved. Nor were the restrictions imposed by the interim ordinance unreasonable in scope given the seriousness of the danger posed by the construction of new structures in Lutherglen and nearby properties. We cannot say that without a thoroughgoing study it would have been reasonably feasible to identify *any* structure which could be safely permitted on these properties. Thus we find the time taken by this study and the time this interim ordinance remained in effect to be well within the bounds of reason. The County owed this landowner no special duty to give priority to the study of Lutherglen over the study of other properties which might pose a danger to safety. Nor did it owe any of these landowners a duty to cut any corners in the study or take any risks

that anything might be overlooked which could produce a permanent ordinance less restrictive than public safety concerns demanded.

IV. *Since There Was No Unconstitutional "Taking" of Lutherglen, First English Has Not Stated a Cause of Action Entitling It to Compensation*

Since we hold the instant complaint is insufficient to state a cause of action that the limitations imposed by the interim ordinance represented an unconstitutional "taking" of First English's property it follows First English is not entitled to compensation for a "temporary taking" between the time the interim ordinance was enacted and it was superseded by the somewhat less restrictive permanent ordinance. ■ The Supreme Court's majority opinion in *First Lutheran Church* held property owners are entitled to compensation for so-called "temporary takings", but only where the government regulation in question is ultimately ruled to have worked an unconstitutional taking. "Invalidation of the ordinance or its successor ordinance after this period of time, though converting the taking into a 'temporary' one, is not a sufficient remedy to meet the demands of the Just Compensation Clause. . . .We merely hold that where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." (*First Lutheran Church* v. *Los Angeles County, supra,* 482 U.S. at pp. 319, 321 [96 L.Ed.2d at pp. 267, 268].) ■ Here we find interim ordinance No. 11,855 did not "work a *taking* of all use" of appellant's property. Consequently, there is no "duty to provide compensation for the period during which [that ordinance] was effective."

DISPOSITION

The judgment dismissing the cause of action for inverse condemnation based on enactment of ordinance No. 11,855 is affirmed for the reasons recited in this opinion. In all other respects the opinion this court filed on June 25, 1985, and in which remittitur issued on November 4, 1985, remains in full force and effect. Accordingly, the case is remanded for further

proceedings consistent with that opinion as to the cause of action for inverse condemnation based on cloud seeding.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied June 23, 1989, and appellant's petition for review by the Supreme Court was denied August 25, 1989. Lucas, C. J., Panelli, J., and Kaufman, J., were of the opinion that the petition should be granted.