**TRUMBULL DIVISION, OWENS–CORNING FIBERGLASS CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**CITY OF MINNEAPOLIS, Defendant.**

No. 4–73–Civ. 342.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 14, 1978.

Frank A. Dvorak, Mackall, Crounse & Moore, Minneapolis, Minn., for plaintiff.

Edward R. Kenneally, Asst. City Atty., Minneapolis, Minn., for defendant.

## MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

LARSON, Senior District Judge.

### FINDINGS OF FACT

1. Plaintiff Trumbull Division, Owens-Corning Fiberglass Corporation is a Delaware corporation, with its principal place of business in Chicago, Illinois. Plaintiff has operated an asphalt manufacturing plant in Minneapolis, Minnesota, for over 25 years.

2. Defendant City of Minneapolis is a municipality of the State of Minnesota.

3. Plaintiff's plant is adjacent to the Fry Roofing Company. Both companies were sold to Owens-Corning Fiberglass Corporation in April 1977, but prior to that time were separately owned, had no common directors and operated as separate and independent businesses. Plaintiff furnishes asphalt to most of the roofing manufacturing companies in this area and in a surrounding four State area. When the Fry Roofing Company was in operation, plaintiff also furnished asphalt to Fry.

4. In 1969 the City of Minneapolis passed an ordinance requiring a license to manufacture asphalt. Minneapolis Code Chapter 385, recodified as Minneapolis Code Chapter 269.[1] The City Council is vested with the authority to issue, renew and revoke such licenses.

5. The licensing year runs from December 1 of one year to November 30 of the succeeding year.

6. The City Council has a standing subcommittee that deals with licensing matters, variously called the Committee on Licenses, the Committee on Licenses and Consumer Services, and hereafter referred to as the Committee.

7. In the short license year 1969, the year 1969–70, and the year 1970–71, plaintiff applied for and was granted a license to manufacture asphalt.

8. Plaintiff applied for a license for the year 1971–72. No written objections to the license were filed by any of the officials named in the ordinance as having authority to investigate and object to such licenses. The Supervisor of the Air Pollution Department had filed a written approval.

9. Although the ordinance does not require aldermanic approval of license applications, the application form for asphalt manufacturing contains a signature space for aldermanic approval and the applications are routinely referred to the ward alderman. Plaintiff's application for 1971–72 was not approved by the alderman of the ward in which plaintiff's plant is located.

10. On December 29, 1971, the Committee had before it the license applications of both Fry Roofing and Trumbull. Neighborhood complaints of pollution and odor from the plants were discussed. The Committee was advised that the Trumbull application had all the necessary official approvals. The license was laid over and referred to the Minnesota Pollution Control Agency.

11. The Trumbull application was laid over at various other times during the year and no final action was ever taken on it.

12. Plaintiff applied for a license for the year 1972–73. No written objections to the license were filed by any of the officials named in the ordinance as having authority to investigate and object to such licenses. The Supervisor of the Air Pollution Department had filed a written approval. The application was not approved by the ward alderman.

13. In a meeting of the Committee on June 6, 1973, the Fry and Trumbull applications were again considered at the same time. The Committee voted to lay over a denial of both applications and to issue call-ins to the applicants. A call-in is a form sent to a license applicant only when its application is in jeopardy to inform him that the Committee will consider the application at a subsequent meeting. Applicants receive no notice of other committee actions such as lay-overs, referrals or postponements.

---

1. Some minor and relatively unimportant changes were made in the ordinance when it was recodified. It presently reads, in pertinent part:
 "Application for such license shall be made to the city council on forms supplied by it, which shall include a statement of the address where such manufacturing is to be conducted. Before the issuance of any such license, the director of inspections, the health inspector and the chief of the fire department shall be notified of the application therefor. If any such official, after proper investigation shall file objections, the city council, after a hearing thereon, may refuse for cause to grant or reissue such license." Minneapolis Code Ch. 269.20.

14. On June 27, 1973, the Committee voted to recommend disapproval of Trumbull's license application to the City Council.

15. On June 29, 1973, the City Council voted to deny Trumbull a license.

16. On July 3, 1973, the manager of the Trumbull plant was arrested for operating the plant without a license.

17. In light of the arrest, Trumbull instituted action in this Court. A preliminary injunction was granted on July 20, 1973, enjoining the City from issuing further tags, complaints, or warrants against Trumbull for operating without a license. Trumbull is still operating under the protection of that Order.

18. The Court specifically found that as of the time the Trumbull license was denied in 1973, pollution and odors existed in the vicinity of plaintiff's plant and had persisted for some time. Memorandum Order and Rule 52 Findings, July 20, 1973.

19. Trumbull worked with the City Attorney, the Minnesota Pollution Control Agency and the Minneapolis Air Pollution Department for two years, attempting to bring its pollution control equipment into compliance with City and State requirements. Substantial improvements were made to the plant.

20. Plaintiff applied for a license for the 1975–76 licensing year. The officials named in the ordinance as having authority to investigate and object to such licenses had filed no written objections to the application or had indicated approval, including the Supervisor of the Air Pollution Department. The application was not approved by the alderman for the ward.

21. On April 7, 1976, the Committee laid over the Trumbull application.

22. On April 28, 1976, the Committee was informed that Trumbull had all the required approvals under the ordinance. The license application was laid over.

23. On May 28, 1976, the Committee laid over the application again and referred it to an Administrative Committee.

24. At the urging of the Administrative Committee, Trumbull made further repairs to parts of its property, paving a driveway and straightening a snow fence.

25. The 1975–76 license application was laid over seventeen times. No final action was ever taken on it.

26. Plaintiff applied for a license for the year 1976–77. All of the departments required under the ordinance either approved the application or noted no disapproval, except the Air Pollution Department which disapproved. That department reversed its position within a matter of weeks and approved the application. The application was not approved by the alderman for the ward.

27. The application for 1976–77 was on the Committee agenda at least nine times and was never acted upon.

28. As of the time of trial, June 27–28, 1977, plaintiff had expended over $380,000 since 1968 in upgrading its plant in order to satisfy State and City pollution control standards; $260,000 of that sum has been expended in the last four years. Every piece of equipment that the State required or requested, with the exception of an oil water separator awaiting installation, had been put into the plant. Trumbull has operational permits from the Minnesota Pollution Control Agency for all of its plant equipment.

29. At various Committee meetings over the years, plaintiff was frequently identified by Committee members and witnesses with the Fry Roofing Company. Past and present aldermen for the ward in which Trumbull and Fry are located testified that they thought of the two companies as one problem. The applications of the two were frequently considered at the same time. The Committee was informed that Trumbull has been involved in numerous lawsuits with the City over its license when, in fact, it was Fry that had been litigious, while Trumbull had been a party only to this suit. The failure to treat the companies as separate entities disadvantaged plaintiff, for unlike the apparent intransigence of Fry Roofing, Trumbull's attitude has been one

of cooperation with the City and it has made reasonable efforts to comply with the ascertainable standards for receiving a license.

30. Committee meetings are informal, legislative-type hearings. An applicant for a license may not always be aware of when or if the Committee is taking some action on his application; witnesses against an applicant are not sworn; cross-examination is not conducted, although inquiries of witnesses are permitted with varying degrees of liberality; no written findings are made as to the basis for Committee action.

## CONCLUSIONS OF LAW

### I.

Although the parties have not contested this Court's jurisdiction, the Court has an obligation to inquire into the matter. *See Kenosha v. Bruno,* 412 U.S. 507, 511, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). The prerequisites for diversity of citizenship exist, since plaintiff's place of incorporation and principal place of business are in States other than Minnesota, *see* 28 U.S.C. § 1332(c), and the City of Minneapolis is deemed a citizen of this State, *see Illinois v. City of Milwaukee, Wisc.,* 406 U.S. 91, 97, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). Moreover, plaintiff has alleged a deprivation of its constitutional right to due process, which gives rise to Federal question jurisdiction under 28 U.S.C. § 1331, *see Kenosha v. Bruno, supra,* 412 U.S. at 516, 93 S.Ct. 2222 (Brennan, J., concurring); *Amen v. City of Dearborn,* 532 F.2d 554, 559 (6th Cir. 1976). The $10,000 amount in controversy requirement is satisfied, for deprivation of a license to operate its business could cause plaintiff monetary losses in at least that amount from lost contracts, damage to its business relationships and loss of the benefits of the $380,000 in capital improvements over the last decade in its plant.

Plaintiff has alleged in count four of its complaint that its Federal right to procedural due process has been denied and in counts one, two and three that the licensing ordinance, or the City's application of it, violates other State and Federal laws as well. The procedural due process claim will be discussed separately from the rest, for different considerations underlie a decision on each.

### II.

In *Hornsby v. Allen,* 326 F.2d 605, *rehearing denied,* 330 F.2d 55 (5th Cir. 1964), the Fifth Circuit held that a municipality could not deny liquor license applications unless the applicants were afforded the due process safeguard of a trial-type hearing. Since that case Federal courts have faced numerous due process challenges to the actions of municipalities in issuing, denying, renewing, or revoking licenses to operate various types of businesses. *See e. g., Block v. Thompson,* 472 F.2d 587 (5th Cir. 1973); *Atlanta Bowling Center, Inc. v. Allen,* 389 F.2d 713 (5th Cir. 1968); *Lewis v. Grand Rapids,* 356 F.2d 276 (6th Cir.), *cert. denied,* 385 U.S. 838, 87 S.Ct. 84, 17 L.Ed.2d 71 (1966); *Tollett v. Laman,* 497 F.2d 1231 (8th Cir.), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 678, 42 L.Ed.2d 680 (1974), *rehearing denied,* 420 U.S. 939, 95 S.Ct. 1150, 43 L.Ed.2d 416 (1975); *Wallach v. Pagedale,* 376 F.2d 671 (8th Cir. 1967); *Mosher v. Beirne,* 357 F.2d 638 (8th Cir. 1966); *Page v. Jackson,* 398 F.Supp. 263 (N.D.Ga.1975); *Manos v. Green Bay,* 372 F.Supp. 40 (E.D.Wis.1974); *Oberhelman v. Schultze,* 371 F.Supp. 1089 (D.Minn.), *aff'd* 505 F.2d 736 (8th Cir. 1974); *Haaf v. Board of County Commissioners of Benton County,* 337 F.Supp. 772 (D.Minn. 1971). There is little disagreement with the general proposition established in *Hornsby* that municipalities, when they act as licensing bodies, may be subject to the requirements of due process; but courts have differed sharply on what particular requirements may apply in any given situation.[2]

---

**2.** The Eighth Circuit has not decided a case directly on point. In *Wallach v. Pagedale, supra,* for example, a complaint alleging that a city licensing ordinance violated plaintiff's con-

stitutional rights was dismissed on jurisdictional grounds. In *Tollett v. Laman, supra,* however, plaintiff was the holder of a trailer park license which was revoked without notice.

*Compare Lewis v. Grand Rapids, supra,* with *Manos v. Green Bay, supra.* Although the Supreme Court has not directly addressed this issue, its recent procedural due process decisions in other contexts provide a framework for analysis of plaintiff's claims. *See e. g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *see generally,* K. Davis, *Administrative Law in the Seventies,* ch. 7 (1976).

■ As *Roth* and *Perry, supra,* make clear, the starting point for analysis is whether a "property" right is at stake. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to such benefits." *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709. Plaintiff here has more than a mere expectancy or abstract hope of license renewal; it has a legitimate claim of entitlement to its license. The investment necessary to carry on an asphalt manufacturing business could not be made unless there were an understanding that operations could continue from year to year. A shut-down of the plant would cause plaintiff a "grievous loss." *Joint Anti-Facist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), *quoted in Goldberg v. Kelly, supra,* 397 U.S. at 263, 90 S.Ct. 1011. Moreover, the City and State, by requesting or requiring plaintiff to expend its funds on proper equipment, have strengthened the natural assumption that once compliance had been achieved, a license would surely be forthcoming. It requires no extended discussion to conclude that the rules defining plaintiff's interest in its license do, as a matter of social and economic reality, create a property right. *See Manos v. City of Green Bay, supra; Page v. Jackson, supra.*

■ The second step of the analysis is to determine what process is due in light of the importance of the interest at stake. It is axiomatic that due process is a flexible concept and that the particular procedural safeguards that may be required in any given situation vary with the governmental function involved and the nature of the rights affected. *Goldberg v. Kelly, supra,* 397 U.S. at 263, 90 S.Ct. 1011. Federal courts have differed on what protections may be necessary in municipal licensing situations. *Compare Manos v. Green Bay, supra,* with *Page v. Jackson, supra.* In some instances, notice and a chance to speak have been deemed sufficient. *See Lewis v. Grand Rapids, supra. Hornsby v. Allen, supra,* on the other hand, mandated a full trial-type hearing. This Court is also persuaded that more than notice and a chance to speak must be provided, for this case vividly illustrates that informal hearings may be insufficient to protect the interests at stake. Plaintiff was often identified with another company by witnesses and Committee members; plaintiff rarely knew in advance what particular charges it would have to meet; some charges were unsubstantiated; since 1975, plaintiff's application has been delayed repeatedly by the Committee and never acted upon by the Council; plaintiff was given no formal statement of the reasons for the inaction, and hence, even after expending substantial sums to satisfy the City, plaintiff could not tell precisely what more it had to do in order to qualify for a license. Although the Court has due regard for the exigencies of city management and the importance of flexibility and administrative discretion, a licensing process subject to so many irregularities is fundamentally unfair. It both jeopardizes the property owner's rights and ill serves the public, for where license deni-

---

The Eighth Circuit noted its agreement with the district court that notice and a hearing was required before revocation could occur, 497 F.2d at 1233 n.3, citing *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), but in the context of the case did not need to reach the issue of what type of hearing had to be held.

als are based on unstated reasons or unsubstantiated evidence, responsible businesses can only be discouraged from trying to work within a community and respond to the public's legitimate needs.

Although the City has not addressed itself to this point, the only "two arguable factors suggesting the foregoing of an adversary-type hearing [are] cost and inconvenience." *Misurelli v. Racine,* 346 F.Supp. 43, 48 (E.D.Wis.1972), *overruled on other grounds, Kenosha v. Bruno, supra.* While these factors are not insignificant, neither outweighs plaintiff's interest in being fairly treated where so substantial a property right is at stake. There are methods by which the City can recoup its costs[3] and while an adversary hearing may be slightly more inconvenient, where issues of adjudicative fact are in dispute it is the most effective method of discovering all of the facts and making fully informed decisions.

In order to comply with procedural due process requirements, the City must institute the following safeguards when it acts to revoke,[4] deny, or refuse to reissue licenses under Minneapolis Code Ch. 269:

1. Timely notice of a renewal or revocation hearing must be given and the reasons upon which possible denial may be based must be stated in the notice. The applicant must be afforded adequate time to investigate the charges and prepare its defense.

2. At the hearing, the applicant must be given the opportunity to respond to the charges against it and present evidence on its own behalf.

3. The applicant must have the chance to present evidence through witnesses who are under oath, and to confront and cross-examine opposing witnesses under oath.

4. The hearing body must provide a written statement of reasons for the license denial and those reasons must be based on evidence adduced at the hearing.

■ A few other points should be clarified. Plaintiff has argued that a trial-type hearing must be held by the City Council itself, citing *Shaw v. Hospital Authority of Cobb County,* 507 F.2d 625 (5th Cir. 1975). It is sufficient to note that the case upon which plaintiff relies is readily distinguishable from the case at hand[5] and that such a requirement is far too impractical in this context. So long as the Council's final decision is based upon the record, the Council may delegate to a committee the task of holding hearings, developing the evidence, and making recommendations. *See e. g., Sosa v. Board of Managers of Val Verde Memorial Hospital,* 437 F.2d 173, 177 (5th Cir. 1971).

■ Plaintiff has also argued that holding non-adversary "legislative" type hearings preceding the hearings at which denial actually occurs is a due process abuse. This point is wholly without merit, as has been

---

**3.** The court in *Misurelli v. Racine, supra,* 346 F.Supp. at 48, for example, suggested that the city could tax hearing costs to the losing party and at least partially recoup its expenses.

**4.** A "revocation" has not technically occurred in this case; but where a licensee has run its business for a number of years and the business is one that cannot be readily moved or modified, the difference between a refusal to renew a license and a revocation is slight; it would be somewhat empty relief to require the City to grant procedural protections in a renewal hearing but permit it to revoke without those safeguards.

Although the City has not argued this point, there is perhaps one respect in which a revocation hearing may be different, from the City's point of view, from a renewal hearing: abbreviated decisionmaking might be necessary to close down a business in an emergency. But

the Court need not decide what due process rights might properly be sacrificed in an emergency in order to hold that they must be accorded in the ordinary revocation or renewal hearing.

**5.** In *Shaw,* the Fifth Circuit held that a podiatrist seeking staff privileges at a hospital had to be given a hearing in front of two separate governing bodies. But the two bodies had different by-laws and were separate entities; approval of Shaw's application by one group could still result in his being denied privileges by the other on the basis of its own rules. In short, the question there was not whether a superior body could delegate authority to a subordinate body, but whether a hearing had to be held in front of each board that was empowered to independently grant or deny the privileges.

succinctly stated by another court in an almost identical context:

"What we have said today should not be taken as a condemnation of legislative hearings. As a preliminary step in the licensing procedure, they may well be perfectly proper. In the instant cases, due process was not violated by holding a legislative hearing, but rather due process was violated by omitting an adversary-type hearing. What we hold then is that if legislative hearings are employed in a licensing procedure, then, there must be interposed between the drawing up of charges and the city council vote an opportunity for the applicant to respond as set forth in this opinion." *Misurelli v. Racine, supra,* 346 F.Supp. at 50 n.26.

This Court, too, holds that legislative hearings on plaintiff's license may be held, but an adversary hearing must precede a final decision to deny the license.

■ Finally, plaintiff has asserted that the continued lay-overs of its license application by the Committee and the consequent failure of the Council to act are in and of themselves a due process abuse. Obviously the City could not be permitted to repeatedly postpone action on the plaintiff's license and then attempt to penalize plaintiff for operating without one. But the City did not do so in this case, and the Court assumes that the defendant views delays, when caused *solely* by the City, as a grant of permission to operate until the City acts on the application one way or the other.[6] In order to ensure that harm from further delays is minimized, however, and in light of the evidence that plaintiff's operations pose no present danger to the public

welfare, the Court will order that the injunction of July 20, 1973, remain in effect until the City Council acts on plaintiff's application for the present licensing year in accordance with the procedures set out above.[7] Plaintiff must, of course, take steps to properly apply for a current license, if it has not already done so.

### III.

Plaintiff has raised a number of other questions that present mixed issues of State law and Federal constitutional claims. In count one it asserts that the standards for issuing a license under Chapter 269 are vague and/or arbitrarily applied. In count two it asserts that its property was taken for the public benefit without just compensation. In count three it asserts that the ordinance has been misinterpreted as a matter of State law. Plaintiff also argued that requiring or permitting aldermanic approval of its license application violates State law and the Federal constitution.

Since plaintiff has been granted adequate relief to protect its rights in the immediate future, however, the Court will decline to grant further relief in the nature of a declaratory judgment on these issues. All relate to matters of substance, rather than procedure, for they involve the grounds upon which a license may properly be denied and require a decision on State law before possible Federal constitutional questions can be reached. Yet some of the questions argued have not been sharply presented; the manner in which the City interprets or applies the ordinance, for example, will be more suited to judicial review if and when plaintiff's application is

---

6. The City did not, for example, penalize plaintiff for operating without a license in the 1971–72 year, when the application was repeatedly laid over and never acted upon; the only penalties defendant attempted to impose occurred after the actual denial of a license by the Council in 1973. The City has, of course, been enjoined from penalizing plaintiff since that time, so its present view of the effect of delay is somewhat problematic. Keeping the injunction in force should simply avoid any future problems in this respect.

7. Courts are generally "ill-suited to review the order in which an agency conducts its business." *Environmental Defense Fund, Inc. v. Hardin,* 38 U.S.App.D.C. 391, 397, 428 F.2d 1093, 1099 (1970). In this case, the Court is unapprised of what matters may occupy the Council's attention and is therefore reluctant to order the City to act on plaintiff's 1977–78 license within a set amount of time. But it should be self-evident that this matter should be handled as expeditiously as possible; plaintiff has been deprived of having a Council vote on its application far too long.

actually denied with stated charges, written justifications, and a clear record of the evidence upon which the decision was based.

 More important, the same considerations of Federal-State comity that underlie the abstention doctrine suggest that where uncertain questions of State law predominate, as they do here, a Federal court may properly decline to grant declaratory relief:

> " 'Where resolution of the federal constitutional questions is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law and premature constitutional adjudication.' " *Lake Carriers' Assn. v. MacMullan,* 406 U.S. 498, 511, 92 S.Ct. 1749, 1757, 32 L.Ed.2d 257 (1972) (quoting *Harman v. Forssenius,* 380 U.S. 528, 534, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965)).

As in *Fry Roofing Co. v. City of Minneapolis, aff'd* 551 F.2d 200 (8th Cir. 1977), the Court urges the parties, should it become necessary, "to submit any judicial review of future administrative action to the State courts, which are better equipped to deal with the questions of State law involved."

The Court finds, in the exercise of its discretion, that it is appropriate to decline to decide the issues plaintiff has raised in counts one, two and three of its complaint and to dismiss that portion of the complaint. *Cf. Independent Tape Merchants Assn. v. Creamer,* 346 F.Supp. 456, 464 (M.D.Pa.1972) (appropriateness of dismissal in abstention case).

### ORDER FOR JUDGMENT

IT IS ORDERED THAT:

1. The injunction of this Court entered on July 20, 1973, shall remain in full force and effect until the City Council acts upon plaintiff's application for a license to operate its plant, at which time it shall automatically dissolve.

2. Defendant City of Minneapolis is further enjoined from denying, refusing to reissue, or revoking licenses under the provisions of Minneapolis Code Ch. 269 unless and until the procedural safeguards set out in this opinion are established.

3. Counts one, two and three of plaintiff's complaint are dismissed.

Let judgment be entered accordingly.