**WASTE RECOVERY COOPERATIVE OF MINNESOTA, et al.,**
**Respondents,**

v.

**The COUNTY OF HENNEPIN, Minnesota, et al.,**
**Appellants.**

**No. C0–93–158.**

Court of Appeals of Minnesota.

July 27, 1993.

---

Timothy R. Thornton, Jack Y. Perry, Briggs and Morgan, P.A., Minneapolis, for respondents.

Michael O. Freeman, Hennepin County Atty., Deonne Parker, Asst. County Atty., Minneapolis, for appellants.

Considered and decided by DAVIES, P.J., and HUSPENI and HARTEN, JJ.

## OPINION

HUSPENI, Judge.

In March 1991, respondents Waste Recovery Cooperative of Minnesota, Inc. (WRC) and Poor Richard's, Inc. (PRI), a Hennepin County licensed solid waste hauler, commenced an action seeking a restraining order and damages in connection with appellant Hennepin County's investigation

of the capability of WRC to recycle obsolete U.S. West telephone directories.

U.S. West intervened and moved for a declaratory judgment. The district court denied respondents' motion for a temporary restraining order, and declared that (1) the telephone directories were not "waste" as defined in Minn.Stat. § 115A.03, subd. 34 (1990); (2) Hennepin County, Minn., Ordinance No. 12 did not apply to the telephone directories; and (3) the letter directives of the Hennepin County Department of Environmental Management that required delivery of the directories to a designated county waste facility had no force or effect. The court of appeals affirmed, holding that Hennepin County had no authority over the telephone directories. *Waste Recovery Coop. of Minn. v. County of Hennepin*, 475 N.W.2d 892, 896 (Minn. App.1991), *pet. for rev. denied* (Minn. Dec. 9, 1991).

Respondents reopened the case seeking damages pursuant to 42 U.S.C. § 1983 (1988) contending that the letter directives sent by appellants Hennepin County and Thomas L. Heenan denied them due process of law under the United States and Minnesota Constitutions and were a taking of property without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution. Respondents claim that the entry of appellants Dennis Weiss and John Carlson, two Hennepin County solid waste investigators, onto property where respondents stored the U.S. West directories was an unreasonable search and seizure under the Fourth and Fourteenth Amendments and common law trespass. Respondents also allege appellants tortiously interfered with their contracts.

Concluding "there are substantial issues of fact," the district court denied each of the parties' motions for summary judgment. Appellants seek review of the order on the basis of qualified, discretionary

function, and due care in the execution of a statute immunity. We affirm in part, reverse in part, and remand.

## FACTS

### A. Introduction

U.S. West Direct, a division of U.S. West Marketing Resource Group Inc. (U.S. West), published the 1990 white and yellow pages telephone directories for Minneapolis and St. Paul. After distributing the 1991 directories to its customers, U.S. West advertised that customers could "recycle" their 1990 directories by leaving them in bins at metropolitan Target Stores between January 15 and March 30, 1991.

U.S. West paid WRC $35 per ton for the collected directories. WRC, in turn, hired PRI to transport the directories from Target locations to WRC's warehouse locations in Ramsey County.

In February 1991, Hennepin County, through its Department of Environmental Management, commenced an investigation of WRC's recycling of U.S. West telephone directories. Hennepin County concluded that it had authority over the directories pursuant to the county's waste designation ordinance. Hennepin County, Minn., Ordinance No. 12 (1990).[1] Heenan, principal environmentalist with the county, sent a letter to PRI stating:

> We are aware that *you have contracted with [WRC]* to collect and haul to 45 East Maryland, St. Paul, used phone books from locations in Hennepin County. [WRC] has indicated that they intend to burn at least a portion of the books as fuel. Burning does not meet the definition of recycling [under Minn.Stat. § 115A.03]. Due to the fact these materials are discarded, the books are classified as waste. * * *
> Under Ordinance Number 12, all waste not recycled must be delivered to one of the specific facilities. * * *

1. We note that in *Waste Systems Corp. v. County of Martin, Minn.*, 985 F.2d 1381, 1388 (8th Cir. 1993), the court held that the designation ordinances of Martin and Faribault Counties, which, like the Hennepin County ordinance, required that all designated waste generated within the county be delivered to a designated county facility, were per se invalid under the Commerce Clause of the U.S. Constitution.

*We are directing you to immediately cease removing phone books from Hennepin County until you confirm to our satisfaction that the phone books will in fact be recycled. * * * The phone books* already moved from Hennepin County must be delivered by February 28 to a designated Hennepin County facility unless by that date you have made arrangements suitable to Hennepin County for the recycling of these materials. *Failure to comply with the ordinance may subject you to legal action, and we may also bring action to suspend or revoke your license to haul refuse in Hennepin County.*

(Emphasis added.) Heenan sent a similar letter to WRC and indicated that Hennepin County prohibited WRC from converting the directories into fuel and required WRC to deliver the collected directories to a Hennepin County facility by February 28, 1991, unless WRC confirmed arrangements for recycling.

WRC's initial plans included processing the directories into fuel briquettes. According to the complaint, however, WRC also engaged in processing waste paper into packaging materials and worm bedding. After Hennepin County ordered respondents to cease removing directories from the county until it confirmed WRC was recycling the directories, Hennepin County agreed to permit respondents to haul and process the directories, so long as processing was restricted to production of packaging materials and worm bedding. WRC alleges that by conceding to so restrict processing they made a "substantial concession." However, WRC did not own or lease the equipment necessary to manufacture fuel briquettes. Its five year plan, including the purchase cost of such equipment, required financing of approximately $15 million. While WRC alleged in its complaint that appellants interfered with contracts between WRC and "sources of inter-

im funding for the purchase of manufacture and processing equipment," and asserted that but for the litigation it could have procured financing, efforts to do so previous to the letter directives were fruitless.[2]

### B. Interference with Contracts

According to WRC, a contract existed between it and U.S. West to collect and process the obsolete telephone directories, under the terms of which U.S. West would pay WRC "processing fees" of $35 per ton and WRC would pay PRI for hauling. After conclusion of the declaratory judgment litigation, WRC wrote to U.S. West on February 19, 1992, that "the original contract between U.S. West and WRC does not cover a time frame in which WRC was to have the directories processed."

Respondents also claim that appellants interfered with an alleged hauling agreement between WRC and PRI that provided for payment by WRC to PRI of "normal [hauling] rates." However, PRI's owner received pick-up directions from U.S. West and believed that PRI was "almost * * * guarantee[d] that [it would] get [its] money from U.S. West." While a letter from U.S. West to WRC stated that "[p]ayment to [PRI] for hauling will be provided by [WRC]," PRI's transaction report lists U.S. West, not WRC, as the service name. PRI incurred unpaid hauling and storing expenses, together with finance charges, of $121,688.40.

### C. Trespass

On March 1, 1991, appellants Weiss and John Carlson entered property leased to Haul–A–Way Systems, Inc. in St. Paul to investigate WRC's storage of the telephone directories. Haul–A–Way leased the property from Richard Wybierala, owner of PRI, and had a permit to compost yard waste.

At the property, Weiss and John Carlson met Larry Carlson, a supervisor of the

---

**2.** WRC contacted several venture capitalists and began seeking financing in September 1990. WRC required short-term operating capital of $250,000 and long-term capital of $1.5 million. According to Jeffrey Goodman, one of WRC's directors, several investors expressed interest in financing WRC, but WRC could not procure funding due to the litigation with appellants. One potential investor, for example, indicated that he was prepared to make an investment of "tens of thousands, if not hundreds of thousands of dollars" but for the litigation.

regulatory enforcement program of the Ramsey County solid waste division. According to Larry Carlson, he obtained permission from Steve Isaacson, Haul–A–Way's vice-president, to inspect the site. As a Ramsey County waste official, Larry Carlson routinely inspected the property and claims Isaacson also gave permission for the Hennepin County investigators to inspect the site. Isaacson, however, "strenuously den[ies] that [he] ever gave permission to either Dennis Weiss or John Carlson * * * to enter the property."

When investigating the compost piles located on the Haul–A–Way premises, Weiss found shredded directories, took photographs, and collected samples of the materials. He placed the samples in plastic bags and put the samples in the trunk of his car. During the investigation, Jeffrey Goodman, one of WRC's directors, arrived and told the investigators to immediately leave the property. When Weiss and John Carlson refused to leave, the police were called.

Upon his arrival, a police officer questioned Weiss regarding his authorization to remove the samples. According to the officer's report, after Weiss told the officer that he was "getting involved in something that doesn't concern" him, Weiss said he did not have authorization. In his report, the police officer concluded:

> I feel that the [two] Henn[epin County] investigators attempted a warrantless search and gathering of evidence and without proper authorization, I could not allow them to remain on the property after compl[ainant] told them to leave and I could [not] allow unauthorized removal of any material no matter what the value.

Weiss complied with the officer's request to discard the samples. The officer then told Weiss and John Carlson to leave the property. Once off the property, Weiss

yelled to the officer that the officer "just involved [himself] and the city in a lawsuit," poked his finger in the officer's stomach, and told the officer he was "out of [his] league."

## ISSUES

1. Does qualified immunity protect appellants from respondents' 42 U.S.C. § 1983 (1988) civil rights suit?

2. Does discretionary function immunity under Minn.Stat. § 466.03, subd. 6 (1990) protect appellants from liability for letters sent to respondents?

3. Does due care in the execution of a statute immunity under Minn.Stat. § 466.03, subd. 5 (1990) protect appellants from liability for trespass in the execution of Minn.Stat. § 115A.553 (1990) and Hennepin County, Minn., Ordinance No. 12 (1990)?

## ANALYSIS

■ An order denying a motion for summary judgment is ordinarily not appealable. *Erickson v. County of Clay*, 451 N.W.2d 666, 669 (Minn.App.1990); *see* Minn.R.Civ. App.P. 103.03 (enumerating orders and judgments from which appeal may be taken). However, the denial of a defense motion for summary judgment based on federal and nonfederal doctrines of immunity is immediately appealable. *McGovern v. City of Minneapolis*, 480 N.W.2d 121, 125 (Minn.App.1992), *pet. for rev. denied* (Minn. Feb. 27, 1992).[3]

This court, when reviewing a summary judgment order, must determine whether any genuine issues of material fact exist and whether the trial court erred in its application of the law. Minn.R.Civ.P. 56.03; *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). However, we need not defer to the trial court's decision regarding a legal issue. *Frost–Benco Elec. Ass'n v.*

3. The supreme court first permitted interlocutory appeal of an order denying a defense motion for summary judgment on the basis of federal qualified immunity from a 42 U.S.C. § 1983 (1988) suit in *Anderson v. City of Hopkins*, 393 N.W.2d 363, 364 (Minn.1986). The *Anderson* rationale has been extended to allow interlocutory appeal of a denial of absolute prosecutorial immunity, *Erickson v. County of Clay*, 451 N.W.2d 666, 669 (Minn.App.1990), and nonfederal claims of governmental discretionary function immunity and official immunity, *McGovern v. City of Minneapolis*, 475 N.W.2d 71, 73 (Minn.1991).

*Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

## I.

Appellants first contend that they are immune from suit pursuant to 42 U.S.C. § 1983 (1988) under the doctrine of qualified immunity. We agree. Whether qualified immunity applies to bar a section 1983 claim is a question of law that should be decided by a court "long before trial." *Hunter v. Bryant,* — U.S. —, —, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991). Thus, summary judgment is the most appropriate means of addressing the issue of qualified immunity in a civil rights action. *Harlow v. Fitzgerald,* 457 U.S. 800, 808, 102 S.Ct. 2727, 2733, 73 L.Ed.2d 396 (1982); *Johnson v. Morris,* 453 N.W.2d 31, 40 (Minn.1990).

 Section 1983 imposes liability on persons acting under color of law who deprive another of constitutional or statutory rights, 42 U.S.C. § 1983, and qualified immunity is an affirmative defense available to public officials sued for damages under section 1983. *Elwood v. County of Rice,* 423 N.W.2d 671, 674 (Minn.1988) (citing *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2736). In *Harlow,* the Court established an objective standard for determining whether a government official was acting reasonably. The court held:

> government officials performing discretionary functions generally are shielded from liability for civil damages *insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.*

*Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added). As the doctrine of qualified immunity has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

Respondents assert that appellants violated their "clearly established" rights to (1) due process under the state and federal constitution; (2) compensation for property taken by the government; and (3) freedom from unreasonable search and seizure. We will consider in turn each of these allegations.

### A. Due Process

#### 1. *Minnesota Constitution*

 Respondents' argument that appellants' letter directives violated respondents' right to due process under the Minnesota Constitution[4] is not redressable in a section 1983 action. The federal civil rights statute protects only federal rights. *See Collins v. City of Harker Heights, Tex.,* — U.S. —, —, 112 S.Ct. 1061, 1065, 117 L.Ed.2d 261 (1992) (42 U.S.C. § 1983 does not provide citizens with remedy for those abuses that do not violate federal law); *see also Beard v. Baum,* 796 P.2d 1344, 1351 n. 7 (Ala.1990) (deprivation of rights based on state law not actionable under section 1983); *Williams v. Vermont,* 589 A.2d 840, 849 (Vt.1990), *cert. denied* — U.S. —, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991) (section 1983 only remedies deprivation of rights secured by federal statutory or constitutional law). Therefore, respondents' claimed injury for viola-

---

**4.** The Minnesota Due Process Clause provides that "[n]o person shall * * * be deprived of life, liberty or property without due process of law." Minn. Const. art. I, § 7. In *Thompson v. County of Blue Earth,* 305 Minn. 438, 440, 233 N.W.2d 770, 771 (1975), the court held that the Minnesota Due Process Clause prohibits legislation that imposes a burden on intrastate commerce, such as an ordinance restricting the flow of solid waste across county lines. The federal district court, however, has since noted that *Thompson* was based upon the county solid waste management act that did not expressly grant counties authority to so restrict the transportation of waste. *Waste Systems Corp. v. County of Mar-*

*tin, Minn.,* 784 F.Supp. 641, 646 (D.Minn.1992), *aff'd* 985 F.2d 1381, 1389 (8th Cir.1993). With the adoption of the waste management act, Minn.Stat. §§ 115A.80–.893 (1992), Minnesota through the enactment of county designation ordinances apparently permits boundary restrictions. The federal district court, therefore, granted summary judgment on plaintiff's claim that the designation ordinances violated the Minnesota constitution. *Waste Systems Corp.,* 784 F.Supp. at 646. Ultimately, however, the district court and the Eighth Circuit concluded the ordinances violated the commerce clause of the United States Constitution. *Waste Systems Corp.,* 985 F.2d at 1387.

tion of the Due Process Clause of the Minnesota Constitution is not proper under 42 U.S.C. § 1983.

### 2. *Federal Procedural Due Process*

■ Respondents allege that appellants' letter directives requiring that the directories be delivered to Hennepin County and threatening to revoke PRI's solid waste hauler's license violated respondents' right to procedural due process under the Fourteenth Amendment.[5] We agree with appellants that qualified immunity under section 1983 applies to respondents' Fourteenth Amendment claim.

Due process protection arises where there has been a deprivation of liberty or property in the constitutional sense and the government's deprivation procedures were constitutionally inadequate. *Rivera v. Marcus*, 696 F.2d 1016, 1022 (2d Cir.1982). Procedural due process in essence requires that the government provide an aggrieved party with an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976).

Here, appellants did not take possession of the directories or instigate a process to revoke PRI's license. Although WRC and PRI may have a constitutionally protected property interest in the directories and license respectively, appellants' actions did not result in a deprivation sufficient in the constitutional sense to invoke the requirement of due process. *Cf. Trumbull Div., Owens–Corning Fiberglass Corp. v. City of Minneapolis*, 445 F.Supp. 911, 915 (D.Minn.1978) (municipalities acting as licensing bodies may be subject to due process requirements when issuing, denying, renewing, or revoking licenses to operate a business). Consequently, under the undisputed facts of this case respondents did not have a clearly established right to procedural due process.

---

5. No state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

6. Respondents also cite the taking provision of the Minnesota Constitution. *See* Minn. Const. art. I, § 13 ("[p]rivate property shall not be

### B. *Eminent Domain*

■ Respondents also allege that the letter directives were a taking of property by Hennepin County and that they have a clearly established constitutional right to just compensation under the Fifth and Fourteenth Amendments of the United States Constitution.[6] Respondents' identification of the property appellants allegedly took has metamorphosed during the proceedings. Respondents' complaint alleged that appellants unconstitutionally "expropriat[ed]" the directories themselves. Respondents, however, based their takings claim both here and before the district court on appellants' alleged interference with respondents' contracts. Because the record does not indicate that appellants physically took possession of the directories, we limit our analysis of the taking issue to the alleged contracts. *See Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992) (compensable taking may occur where property owner suffers a physical invasion of his property).

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Court has stated that the Fifth Amendment serves

> not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.

*First English Evangelical Church v. County of Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 2385–86, 96 L.Ed.2d 250 (1987) (emphasis in original).

For the purpose of our analysis of the taking issue, we must assume that the alleged contracts did in fact exist.

Personal property is subject to the exercise of the power of eminent domain.

taken, destroyed or damaged * * * without just compensation"). As discussed in the due process analysis above, section 1983 provides no remedy for violations of the state constitution. Hence, inquiry into Minnesota standards for a taking is unnecessary.

Intangible property, such as choses in action, patent rights, franchises, charters, or *any other form of contract* are within the scope of this sovereign authority as fully as land or other tangible property.

1 Julius L. Sachman & Patrick J. Rohan, *Nichols' The Law of Eminent Domain* § 2.1[2] (3d ed. 1993) (emphasis added). The Court has held that contractual rights may constitute "property" under the Fifth Amendment. *See Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) ("[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States"). Likewise, the Minnesota Supreme Court has held that a municipality's eminent domain power extended to contracts. *See City of Shakopee v. Minnesota Valley Elec. Coop.,* 303 N.W.2d 58, 60 (Minn.1981) (condemnation of property and distribution facility of utility included all service contracts for utility's customers where consistent use of property was intended).

Whether government regulation or restriction on property goes too far and constitutes a taking is not resolved by application of a rote judicial formula. *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Instead, judicial determinations rely on ad hoc factual inquiries and case-specific weighing of competing public and private interests. *Id.*

Mere governmental interference with a contract is not sufficient to establish a taking. Otherwise, any governmental interference with contracts would give rise to a Fifth Amendment claim. A taking occurs when the governmental interference is substantial and deprives all "economically beneficial or productive uses" of the contract. *Lucas,* —— U.S. at ——, 112 S.Ct. at 2893.

Respondents contend that they could do nothing with the directories after the appellants sent the letter directives on February 15 until December 9, 1991, when the Minnesota Supreme Court denied appellants' petition for further review.

However, we agree with appellants that the government's act did not deprive respondents of all economically viable uses of the contracts. By the plain terms of the letter directives, appellants would have permitted recycling. Likewise, the alleged contract with U.S. West did not unequivocally require WRC to process the directories into fuel briquettes. On the contrary, the contract called merely for "processing," and the facts indicate that respondents did, in fact, process some directories into worm bedding and packaging materials. As such, the contract and directories had economic value. Accordingly, there was no deprivation of all economically beneficial or productive uses of the contract. *See id.*

We cannot end our inquiry here, however. If the governmental action does not deprive a property owner of all economically beneficial or productive uses of the property, then we must analyze the governmental interference in light of the three factors articulated by the *Penn Central* court. Under *Penn Central,* whether a taking occurs depends on (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental regulation. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659; *Woodbury Place Partners v. City of Woodbury,* 492 N.W.2d 258, 260 (Minn.App.1992), *pet. for rev. denied* (Minn. Jan. 15, 1993), *cert. denied* —— U.S. ——, 113 S.Ct. 2929, 124 L.Ed.2d 679 (1993).

While appellants' investigation of WRC's recycling capabilities had an economic impact on respondents insofar as the letter directives limited the types of processing permitted, the contract remained economically viable. This weighs against finding that a taking occurred. *See Parranto Bros. v. City of New Brighton,* 425 N.W.2d 585, 591–92 (Minn.App.1988) (the fact that rezoned property remained economically viable weighed against finding the rezoning constituted a taking), *pet. for rev. denied* (Minn. July 28, 1988).

Most importantly, the governmental act did not interfere with WRC's investment backed expectations. *See Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. The record demonstrates that respondents had no investment backing before the letter directives. WRC did not demonstrate sufficient backing to manufacture fuel briquettes from waste, which is heavily regulated by the state and municipalities. *See Waste Systems Corp. v. County of Martin, Minn.,* 784 F.Supp. 641, 646 (D.Minn. 1992) (finding no investment-backed expectation that the highly regulated waste disposal industry would not experience regulatory changes).

Under the third *Penn Central* factor we must examine the character of the governmental regulation. Where, as here, the governmental action is part of a comprehensive plan and has not deprived the owner of all reasonable uses of the property, the action is not of the character to find a taking occurred. *McShane v. City of Faribault,* 292 N.W.2d 253, 257 (Minn.1980). Thus, we conclude that respondents have not demonstrated the letter directives constituted a taking under *Penn Central,* and appellants are entitled to immunity.

There is yet a third taking analysis under which appellants could lose immunity under section 1983 as to respondents' Fifth Amendment suit. A taking occurs if the government's act did not "substantially advance legitimate state interests." *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).

> We have required that regulation "substantially advance" the "legitimate state interest" sought to be achieved, not that "the State *'could have rationally decided'* that the measure adopted might achieve the State's objective."

*Nollan v. California Costal Comm'n,* 483 U.S. 825, 834 n. 3, 107 S.Ct. 3141, 3147 n. 3, 97 L.Ed.2d 677 (1987) (emphasis in original) (citations omitted).

The legislature declared that the policy of the waste management act was to separate and recover "materials and energy from waste" and to reduce "indiscriminate dependence on disposal of waste." Minn.

Stat. § 115A.02(a) (1990). The waste management act requires that counties or districts designate a solid waste processing or disposal facility. Minn.Stat. § 115A.80 (1990). The law requires that all or a portion of waste generated within the county or district be delivered to a processing or disposal facility within the county or district. Minn.Stat. § 115A.81, subd. 2 (1990). Exempted from designation is material separated and recovered for reuse in its original form or for use in manufacturing process or materials separated for recycling. Minn.Stat. § 115A.83, subd. 2 (1990).

In addition to the government's substantial interest in waste management, the government also has a substantial interest in curbing fraudulent recycling activities. Appellants, therefore, had a legitimate interest in investigating whether the directories would be recycled, and issuing the letter directives. We conclude their actions advanced a legitimate state interest. *See Agins,* 447 U.S. at 260, 100 S.Ct. at 2141. Subsequent determination that this statute did not apply in the specific facts of this case does not alter our analysis and conclusion that the letter directives were issued to substantially advance a state interest.

Appellants' act of sending the letter directives did not violate respondents' Fifth and Fourteenth Amendment rights to just compensation for property taken by the government. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The trial court, therefore, erred in denying summary judgment on the issue of qualified immunity as to respondents' eminent domain claim.

### C. Search and Seizure

Respondents' argument to the district court that appellants' investigatory entry onto the compost yard premises violated the Fourth Amendment's prohibition of unreasonable governmental searches and seizures must fail. Under the Fourth Amendment, a trespass, intentional or negligent, is merely a common law tort and does not infringe the federal constitution. *Kao v. Red Lion Mun. Auth.,* 381 F.Supp. 1163, 1166 (M.D.Penn.1974). In order to show a violation of a protectable Fourth

Amendment interest, respondents must show they had a legitimate expectation of privacy in the area searched. *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); *State v. Gray*, 456 N.W.2d 251, 255 (Minn.1990), *cert. denied* 498 U.S. 1030, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991).

The premises used as the yard compost site which Weiss and John Carlson entered had a posted sign at the gate reading "Compost Yard Waste * * * Hours 8 a.m. to 5 p.m. Mon–Sat." There were no "no trespassing" signs posted on the property. The property is visible from the street, from which appellants initially observed what appeared to be shredded directories in compost piles. As a matter of law, respondents had no legitimate expectation of privacy in the area searched and there was accordingly no Fourth Amendment violation. *See United States v. Ventling*, 678 F.2d 63, 66 (8th Cir.1982) (per curiam) (no reasonable expectation of privacy in rural driveway with no gate but a posted "no trespassing" sign). Although they collected samples of the shredded directories, appellants did not remove any samples from the property.

We conclude that Weiss's and John Carlson's conduct did not violate a clearly established Fourth Amendment constitutional right. *See Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. Qualified immunity applies to the section 1983 claim as to alleged violations of the Fourth Amendment.

## II.

We agree with appellants that Minn.Stat. § 466.03, subd. 6 (1990) provides them with discretionary function immunity for alleged torts arising out of the letter directives sent to respondents.

A county government is subject to liability for its torts and those torts committed by its officers and employees acting within the scope of their employment or duties. Minn.Stat. § 466.02 (1990); *Johnston v. Michael Shea & Assocs.*, 425 N.W.2d 263, 267 (Minn.App.1988), *pet. for rev. denied* (Minn. July 28, 1988). Excepted from liability, however, is "[a]ny claim based upon the performance or failure to exercise or perform a *discretionary function* or duty, whether or not the discretion is abused." Minn.Stat. § 466.03, subd. 6 (emphasis added). A court must narrowly construe the exceptions, *Johnston*, 425 N.W.2d at 267, and should always consider that the exception seeks to protect policy-based decisions and "prevent the impairment of effective government," *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 719 (Minn.1988). The courts are not the appropriate forum to second guess governmental actions that involve the exercise of judgment or discretion. *Cairl v. State*, 323 N.W.2d 20, 23 (Minn.1982).

■ Whether appellants Hennepin County and Heenan are entitled to discretionary function immunity in issuing the letter directives is a question of law for this court to review without deference to the trial court. *See Snyder v. City of Minneapolis*, 441 N.W.2d 781, 786 (Minn. 1989) (whether acts are discretionary is a question of law). "[E]ach case must be judged in a fashion which focuses on whether the legislature intended to immunize the particular governmental activity" at issue. *Nusbaum*, 422 N.W.2d at 719. Discretionary function immunity protects a governmental act that "involves a balancing of policy objectives" *Id.* at 722. The government has the burden to produce evidence that the conduct "was of a policy-making nature involving social, political, or economical considerations." *Id.*

■ Respondents assert that Heenan had no legitimate basis to conclude the directories were "waste" subject to the county's authority under Ordinance No. 12 or to conclude that briquetting was not "recycling." Heenan's application or interpretation of the ordinance, respondents argue, did not involve a "policy determination" or a "planning-level decision." We disagree, and conclude that Heenan's interpretation of the statutes and ordinance to confer county jurisdiction over the directories, even though incorrect, is protected by discretionary function immunity.

Hennepin County, Minn., Ordinance No. 12, § 3.01 (1990) provides:

> All Designated Waste generated within the county, including loads that contain designated waste with undesignatable waste or problem materials, shall be delivered to a designated facility.

"Designated waste" includes mixed solid waste generated in Hennepin County, excluding hazardous, infectious, and undesignatable waste. Hennepin County, Minn., Ordinance No. 12, § 2.06 (1990). Mixed solid waste, under state law, is defined as:

> garbage, refuse, and other solid waste * * * which is generated and collected in aggregate, but does not include auto hulks, street sweepings, ash, construction debris, mining waste, sludges, tree and agricultural wastes, tires, lead acid batteries, used oil, and other materials collected, processed, and disposed of as separate waste streams.

Minn.Stat. § 115A.03, subd. 21 (1990). State law exempts from county designation "materials that are separated from solid waste and recovered for reuse in their original form or for use in manufacturing processes." Minn.Stat. § 115A.83, subd. 2(1) (1990). "Recyclable materials," similarly, are materials separated from mixed municipal solid waste for the purpose of recycling but does not include "[r]efuse-derived fuel or other material that is destroyed by incineration." Minn.Stat. § 115A.03, subd. 25a (1990). Recycling is

> the process of collecting and preparing recyclable materials and reusing the materials in their original form or using them in manufacturing processes that do not cause the destruction of recyclable

materials in a manner that precludes further use.

Minn.Stat. § 115A.03, subd. 25b (1990).

In deciding to investigate WRC's recycling capabilities, Heenan was called upon to make a determination of whether the directories fell under the definition of waste in Minn.Stat. § 115A.03, subd. 21 and were subject to the jurisdiction of the county under Ordinance No. 12 or were exempted from the designation requirement of Minn.Stat. § 115A.83, subd. 2(1). Heenan was also required to determine whether fuel briquetting, WRC's initial planned use of the directories, constituted "recycling."[7]

Minnesota courts have held that the act of a municipal employee issuing various types of permits was an exercise of discretion protected from liability under Minn. Stat. § 466.03, subd. 6. *See Anderson v. City of Minneapolis*, 287 Minn. 287, 288, 178 N.W.2d 215, 217 (1970) (employee issuing building permit exercised discretion in determining whether building plans constituted a permissible use of property); *Masonick v. J.P. Homes, Inc.*, 494 N.W.2d 910, 913 (Minn.App.1993) (act of building inspector issuing a certificate of occupancy was a protected discretionary function). However, if no discretion is involved, such as when a proposed land use authorized in a building permit is clearly illegal, immunity does not protect the municipality. *Anderson*, 287 Minn. at 289, 178 N.W.2d at 217.

Although the trial court subsequently determined in the declaratory judgment that there was only one "sensible interpretation" of the statute defining waste, the surrounding circumstances and confusion demonstrated in the record[8] convince this court that Heenan's act in deciding that

7. Although the trial court held that the directories were delivered to WRC for "recycling," neither the district nor appellate court in the first action made any determination of whether briquetting constituted recycling. *Waste Recovery Coop. of Minn. v. County of Hennepin*, 475 N.W.2d 892, 896 (Minn.App.1991), *pet. for rev. denied* (Minn. Dec. 9, 1991).

8. The Minnesota Office of Waste Management and the U.S. Environmental Protection Agency

informed respondents in February 1991 that "recycling" is distinguishable from "energy recovery." The Minnesota agency specifically stated that processing the directories to produce refuse-derived fuel is not recycling under Minn. Stat. § 115A.03, subd. 25b. Respondents argue that briquetting *is* "recycling" because the material is derived from collected, reprocessed and reused materials.

Ordinance No. 12 and state law applied to the directories was a discretionary one.

Similar to determining whether to issue a permit or conduct an investigation into sexual abuse, *see Johnston*, 425 N.W.2d at 268, Heenan was called upon to investigate WRC and to decide whether Hennepin County and state law required the directories be delivered to a designated waste facility, a determination involving balancing social, political, and economical considerations. *See Nusbaum*, 422 N.W.2d at 722. Heenan and Hennepin County are entitled to discretionary function immunity under Minn.Stat. § 466.03, subd. 6.

### III.

■ Appellants next contend that Hennepin County, Weiss and John Carlson are excepted from tort liability for trespass under Minn.Stat. § 466.03, subd. 5 (1990). We disagree. Subdivision 5 excepts a municipality from liability for:

> [a]ny claim based upon an act or omission of an officer or employee, *exercising due care, in the execution of a valid or invalid statute*, charter, ordinance, resolution, or rule.

Minn.Stat. § 466.03, subd. 5 (emphasis added).

This court, for the first time, recently construed subdivision 5 in *Boop v. City of Lino Lakes*, 502 N.W.2d 409 (Minn.App. 1993).[9] *Boop* held that " 'due care' denotes a negligence standard." *Id.* at 411.

Minn.Stat. § 115A.553 (1990) requires that Hennepin County "ensure" that materials separated for recycling are taken to markets for sale or to recycling processing centers. Weiss contacted Larry Carlson, a solid waste officer in Ramsey County, who accompanied Weiss and John Carlson to inspect the yard waste composting facility. Weiss had previously inspected the premises from public property and observed what

appeared to be shredded telephone directories. Appellants claim Larry Carlson obtained permission from Haul–A–Way to allow him, Weiss, John Carlson, and another Ramsey County employee to inspect the premises. These facts, if undisputed, would indicate due care in the execution of section 115A.03, subd. 1. *See Johnson v. Dirkswager*, 315 N.W.2d 215, 223 (Minn. 1982) (due care in the execution of a statute immunity under Minn.Stat. § 3.736, subd. 3(a) (1980) protected the state from liability where it appeared, as a matter of law, the state official exercised due care). However, other facts, those contained in the police report for example, indicate that Weiss and John Carlson did not have permission and acted belligerently after the officer arrived. Weiss and John Carlson produced no evidence they had authority to be present or to remove anything from the premises. Because a material fact dispute exists, we cannot conclude as a matter of law that Weiss and John Carlson were acting with due care in the execution of the statute. The trial court, therefore, properly denied immunity under Minn.Stat. § 466.03, subd. 5 for common law trespass and this issue must be resolved at trial.

### IV.

The parties dispute the extent to which this court may review the nonimmunity issues that appellants raise. Although an appellate court may review "any other matter as the interest of justice may require," Minn.R.Civ.App.P. 103.04, this court recently denied interlocutory review of a companion issue in a discretionary function immunity case. *Masonick*, 494 N.W.2d at 913. There, the court concluded that review of an issue involving a defense to liability and not immunity from suit did not serve justice. *Id.* In light of our disposition on the qualified and discretionary function immunity, we decline to review the issues raised

9. Only two cases from federal courts have previously cited Minn.Stat. § 466.05, subd. 5. Those cases, however, did not establish a standard of review or interpret what the legislature meant by "exercising due care." *See Owen v. City of Independence, Mo.*, 445 U.S. 622, 680–81 n. 20, 100 S.Ct. 1398, 1430–31 n. 20, 63 L.Ed.2d 673

(1980) (Powell, J., dissenting) (citing statutes, including Minn.Stat. § 466.03, subd. 5, that have created immunity for good faith execution of a validly enacted, but unconstitutional, statute); *Bahr v. County of Martin*, 771 F.Supp. 970, 978 (D.Minn.1991).

by appellants separate from those related to immunity.

### DECISION

The district court erred in denying appellants' motion for summary judgment on the issue of qualified and discretionary function immunity. We therefore reverse in part. Appellants are immune from a section 1983 suit and from liability under Minn.Stat. § 466.03, subd. 6, for issuing the letter directives. However, we affirm on the issue of due care immunity under Minn. Stat. § 466.03, subd. 5, and hold as a matter of law that factual issues exist as to whether appellants Weiss and John Carlson executed Minn.Stat. § 115A.553 with due care. We decline interlocutory review of appellants' remaining issues. We remand for trial on the trespass issue.

**Affirmed in part, reversed in part, and remanded.**