**WOODBURY PLACE PARTNERS,**
**Respondent,**

v.

**CITY OF WOODBURY, Minnesota,**
**Appellant.**

**No. C2–92–670.**

Court of Appeals of Minnesota.

Nov. 17, 1992.

Review Denied Jan. 15, 1993.

Gerald S. Duffy, William Christopher Penwell, Anthony J. Gleekel, Siegel, Brill, Greupner & Duffy, P.A., Minneapolis, for respondent.

Pierre N. Regnier, James G. Golembeck, Jardine, Logan & O'Brien, St. Paul, Robert H. Freilich, Richard G. Carlisle, Freilich, Leitner, Carlisle & Shortlidge, Kansas City, Mo., for appellant.

Carla Heyl, League of Minnesota Cities, St. Paul, for amicus curiae League of Minnesota Cities.

Jay M. Heffern, Brian W. Ohm, Metropolitan Council, St. Paul, for amicus curiae Metropolitan Council.

Considered and decided by AMUNDSON, P.J., and LANSING and PETERSON, JJ.

## OPINION

LANSING, Judge.

The City of Woodbury challenges the trial court's determination that, on its face, an interim moratorium on development effected a taking of property without just compensation. We reverse and remand.

## FACTS

This appeal focuses on 505,533 square feet of unimproved land zoned for commercial use in the northwest corner of the intersection of Interstate 494 and Valley Creek Road in Woodbury, Minnesota. Woodbury Place Partners purchased an undivided one-half interest in the property, including all rights in this litigation, in December 1987, and in January 1990 purchased all remaining property rights. In January 1991 the partnership conveyed its interest in the property to a third party.

In March 1987 the City of Woodbury retained a corporate transportation consultant to conduct an access improvement study for I–494. Woodbury specifically directed the consultant to analyze existing congestion problems at the I–494 interchange at Valley Creek Road and to assess the need and possible locations for additional interchanges.

While the traffic flow study was pending, the partnership proceeded on plans to develop its property. In February 1988 the partnership applied to the city for approval of a preliminary plat, site plan and special use permit for the construction of an 80,248 square foot retail center and an 18,344 square foot office building on the property. After discussions with city staff, the partnership revised its development plan to accommodate the consultant's proposed roadway improvements.

On March 23, 1988, the city council adopted an interim moratorium which prohibited acceptance or consideration of subdivision approval, site plan review, comprehensive plan amendments, or rezoning on undeveloped areas adjacent to I–494. Woodbury Ord. No. 1516. Conforming to the moratorium, the city council tabled the partnership's development applications.

Between March 23, 1988, and the moratorium's expiration on March 23, 1990, Woodbury twice denied the partnership a variance.

In July 1988 the partnership brought this action alleging an unconstitutional taking. The partnership and the city agreed to submit the case on separately drafted sets of stipulated facts. Stipulation 47 submitted by the partnership states that they were denied all economically viable use of the property from March 23, 1988, to March 23, 1990, as a result of the moratorium. Stipulations 124 and 125 submitted by the city stated that the moratorium was reasonable and necessary to protect the planning process and to prohibit construction which could adversely affect road design and public health and safety.

The district court found that Woodbury's moratorium effected a compensable taking of the partnership's land from March 23, 1988 to March 23, 1990. Proceedings to determine damages have been stayed pending resolution of this appeal. The Metropolitan Council and the League of Minnesota Cities have filed amicus briefs.

## ISSUE

Does a two-year moratorium enacted pursuant to Minn.Stat. § 462.355 which denies all economically viable use of property to protect a planning process constitute a compensable "taking" under the Fifth Amendment?

## ANALYSIS

### I

The Fifth Amendment[1] provides that "private property [shall not] be taken for public use without just compensation." The essential purpose of this clause is to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 123–124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).

The takings clause originally was applied only to physical appropriations of property, but in 1922 Justice Holmes recognized that regulations on property will also be considered takings if they go "too far." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Just how far a regulation must go before it will be considered "too far" under the Fifth Amendment has not been specifically defined by formula or rule. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. Consequently, judicial determinations have relied on ad hoc factual inquiries and case-specific weighing of the competing public and private interests. *Id.; Agins v. City of Tiburon*, 447 U.S. 255, 261, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).

The Supreme Court has identified factors to guide courts in ad hoc factual inquiries. The factors include: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government regulation. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659; *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986). *See Parranto Bros. v. City of New Brighton*, 425 N.W.2d 585 (Minn.App.1988) (restrictive zoning ordinance held not a taking after applying three-factor inquiry), *pet. for rev. denied* (Minn. July 28, 1988).

In addition the Supreme Court has recognized two categories of regulatory action that constitute compensable takings without a case-specific inquiry or balancing of public and private interests. *Lucas v. South Carolina Coastal Council*, — U.S. —, —, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). The first occurs when regulations compel owners to suffer physical invasion or occupation of their property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102

---

**1.** Although the partnership listed Article I, Section 13 of the Minnesota Constitution in its complaint, its brief and argument focused exclusively on federal case law.

S.Ct. 3164, 73 L.Ed.2d 868 (1982). The second occurs when the regulation "denies all economically beneficial or productive use of land." *Lucas*, —— U.S. at ——, 112 S.Ct. at 2893.

The partnership, relying on *Lucas* and *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), maintains that the city's moratorium on development constitutes the second type of regulatory action and, therefore, the partnership is entitled to compensation without a case-specific inquiry or balancing of public and private interests. We do not read *Lucas* or *First English* to impose this result.

## II

In *Lucas*, the property owner purchased residential lots on the coast of South Carolina to build single family homes. Before Lucas developed the property, the state legislature enacted the Beachfront Management Act. The trial court found that the Act decreed a permanent construction ban which effectively deprived Lucas of any reasonable use of the lots and made them valueless. *Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2890, 120 L.Ed.2d 798 (1992). On the basis of these factual findings the Court applied the categorical rule that "total regulatory takings must be compensated." *Id.* at ——, 112 S.Ct. at 2899.

To invoke the total takings analysis of *Lucas*, the partnership relies exclusively on the stipulation that the moratorium denied all economically viable use of the property from March 23, 1988 to March 23, 1990.[2] We interpret the phrase "all economically viable use for two years" as significantly different from "all economically viable use" as applied in *Lucas*. The two-year deprivation of economic use is qualified by its defined duration. In Minnesota, moratoriums on development to aid planning processes cannot exceed thirty months.

Minn.Stat. § 462.355, subd. 4 (1990). This is significantly different from the presumptively permanent South Carolina regulation which imposed prohibitions on development. That the Woodbury property's economic viability was delayed, rather than destroyed, is implicitly recognized in the language of the stipulation. "[A]ll economically viable use from March 23, 1988 to March 23, 1990" recognizes that economic viability exists at the moratorium's expiration.

By narrowly defining the measurable property interest as a two-year segment, the partnership equates its loss of use to a "total" taking. *Lucas* acknowledges that the "rhetorical force" of the "no economically viable use" rule is "greater than its precision, since the rule does not make clear the 'property interest' against which the loss of value is to be measured." —— U.S. at ——, 112 S.Ct. at 2894 n. 7. However, the Supreme Court has repeatedly resisted attempts to narrowly define attributes of property ownership to show total deprivation of economic use through regulation.

In *Penn Central* the Court explained that:

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel *as a whole* * * *.

438 U.S. at 130, 98 S.Ct. at 2662 (emphasis added). Consistent with this construction, the Court declined to find a categorical taking in *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), when a governmental regulation prohibited the owner from selling his property. The Court reasoned that "where an owner possesses a full 'bundle' of property rights,

---

**2.** In our view the sale of the remaining one-half interest in the property during the moratorium would belie a determination of total economic inviability. However, we are obligated to accept the stipulation for purposes of our analysis.

the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Id.* at 65–66, 100 S.Ct. at 327. This concept was aptly characterized by Justice Stevens in his dissent in *First English:*

> Regulations are three dimensional: they have depth, width, and length. * * * It is obvious that no one of these elements can be analyzed alone to evaluate the impact of a regulation, and hence to determine whether a taking has occurred.

482 U.S. at 330, 107 S.Ct. at 2394.

We acknowledge that no case has specifically addressed the dimension of length of time as it applies to the totality of a taking. Nonetheless the Supreme Court's inclination to measure the economic burden against the value of the property as a whole, rather than against discrete segments, compels us to reject the partnership's argument. *See Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987).

When measured against the value of the property as a whole, rather than against only a two-year time frame, the moratorium did not deny the partnership "all economically viable use" of its property. Delaying the sale or development of property during the governmental decision-making process may cause fluctuations in value that, absent extraordinary delay, are incidents of ownership rather than compensable takings. *Agins v. Tiburon,* 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2143 n. 9, 65 L.Ed.2d 106 (1980).

### III

*First English* does not change this analysis. Although *First English* presented an issue dealing with the dimension of time in the context of a regulatory taking, we cannot apply its holding as broadly as the partnership urges. *First English* essentially held that "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 321, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987).

The *First English* court expressly declined to decide whether a regulatory flood control ordinance prohibiting construction or reconstruction amounted to a taking. *Id.* at 313, 107 S.Ct. at 2384–85. On remand the California appellate court held that the interim "total moratorium" ordinance was by design a temporary measure which could not be a compensable taking. 210 Cal.App.3d 1353, 1372–73, 258 Cal.Rptr. 893 (1989), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 866, 107 L.Ed.2d 950 (1990).

*First English* does not create a new liability standard to determine when a "temporary" taking occurs, but clarifies the appropriate remedy after a taking is recognized. It is uncertain whether the term "temporary taking" as employed by *First English* was even intended to apply to planning moratoriums. The opinion seems to presuppose that "temporary regulatory takings" means "regulatory takings which are ultimately invalidated by the courts." 482 U.S. at 310, 107 S.Ct. at 2383. The apparent reach of *First English* is to retrospectively temporary takings (e.g., regulations subsequently rescinded or declared invalid), not prospectively temporary regulations such as the Woodbury moratorium.[3]

Courts have uniformly construed the essential holding of *First English* narrowly. *See Guinnane v. City & County of San Francisco,* 197 Cal.App.3d 862, 869, 241 Cal.Rptr. 787 (1987); *McCutchan Estates Corp. v. Evansville–Vanderburgh County Airport Auth. Dist.,* 580 N.E.2d 339 (Ind. Ct.App.1991) ("[T]here is nothing in *First English* which alters the established principle that the interim burden imposed on a landowner during the government's deci-

---

**3.** Harvard Law Professor Frank Michelman has interpreted "the *First English* decision [as] not reach[ing] regulatory enactments, even totally restrictive ones, that are expressly designed by their enactors to be temporary * * *." Frank Michelman, *Takings, 1987,* 88 Colum.L.Rev. 1600, 1621 (1988).

sionmaking process, absent unreasonable delay, does not constitute a taking."), *cert. denied,* 488 U.S. 823, 109 S.Ct. 70, 102 L.Ed.2d 47 (1988). Because it has yet to be demonstrated that Woodbury's moratorium amounted to a taking, the remedial rule of *First English* that "temporary" takings must be compensated does not apply.

## IV

Woodbury's two-year moratorium did not deny the partnership "all economically viable use" of their property in the way that phrase has been conceived and applied by the Supreme Court. Consequently, the district court's determination that a categorical taking had occurred on these facts must be reversed.

The three-factor inquiry of *Penn Central,* rather than the categorical rule of *Lucas,* applies to determine whether a compensable taking occurred. Although the stipulations submitted by the parties shed light on the character of the moratorium, they do not resolve the extent to which the regulation interfered with distinct investment backed expectations or the magnitude of the economic impact on the partnership. Consequently, we do not decide on this record whether a compensable taking has occurred under the standards established in *Penn Central* and *Agins.* This question is appropriately resolved on remand.

## DECISION

The district court erred in concluding that Woodbury's two-year moratorium constituted a categorical taking. We remand to the district court for further proceedings to determine whether the moratorium effected a compensable taking.

Reversed and remanded.