**Jay H. WILLIAMS, Plaintiff–Appellant,**

v.

**CITY OF CENTRAL, State of Colorado, Defendant–Appellee.**

**No. 94CA0943.**

Colorado Court of Appeals,
Div. IV.

June 1, 1995.

Rehearing Denied June 29, 1995.

Certiorari Denied Dec. 4, 1995.

Holley, Albertson & Polk, P.C., Eric E. Torgersen, Scott D. Albertson, Golden, for plaintiff-appellant.

Hall & Evans, L.L.C., David R. Brougham, Josh A. Marks, Denver, for defendant-appellee.

Opinion by Judge DAVIDSON.

Plaintiff, Jay H. Williams, appeals from the judgment of the trial court dismissing his claims against defendant, City of Central (Central City), for regulatory taking and inverse condemnation. The issue presented is whether Central City's interim moratorium on development in its gaming district resulted in a compensable temporary taking of Williams' real property. We hold that it did not and, therefore, affirm.

The following facts are not disputed. Williams is the owner of an historic building in Central City known as the Belvidere The-

ater. Williams purchased the Belvidere Theater in 1990, prior to amendment of the Colorado Constitution to allow limited stakes gambling in Central City.

The area in which the Belvidere Theater is located was designated for commercial use at the time of the purchase. In 1991, the designation was changed to gaming district. Limited stakes gambling and all other uses, other than parking lots, were allowed only by special review under the gaming district zoning ordinance. Such special use permits are issued in the discretion of the city council upon application.

The Belvidere Theater was in a state of disrepair when it was purchased by Williams and required substantial renovation and improvements before it could become useable for any economically viable purpose. Under Central City's historic preservation ordinance, the building may not be demolished or remodeled without approval from the Central City Historic Preservation Commission.

In late March or early April of 1992, Williams applied for a special use permit to conduct a limited stakes gambling establishment in the Belvidere Theater. A contract for the sale of the property was then pending contingent upon the issuance of a special use permit for limited stakes gambling.

On April 15, 1992, the city council adopted a resolution which placed a moratorium on further development in the gaming district. All pending special use permit applications were thereby suspended until certain studies were completed concerning Central City's capacity to absorb the growth spawned by the approval of limited stakes gambling. Excepted from the moratorium were uses of property for public works, public utilities, public health or safety facilities, medical offices, hospitals, clinics, county or city social services facilities, and public or private parking lots.

Williams' application for a special use permit was, accordingly, suspended. As a result, the pending sale of the Belvidere Theater fell through.

Ten months after institution of the moratorium, the growth studies were completed and the moratorium was repealed. Williams then filed this action against Central City, asserting that he was entitled to damages because the moratorium effected a temporary regulatory taking of his property and on a theory of inverse condemnation.

The trial court dismissed the entire action for failure to state a claim for relief under C.R.C.P. 12(b)(5) on the grounds that the temporary suspension of special use permits was not a compensable temporary taking under the Fifth Amendment and that, because the moratorium had been repealed, the inverse condemnation claim would not be ripe until Williams had attempted unsuccessfully to obtain a special use permit. We agree with the trial court on both issues.

I.

A governmental regulation that prohibits all reasonable use of property constitutes a taking within the meaning of the Fifth Amendment and Colo. Const. art II, § 10. *Van Sickle v. Boyes*, 797 P.2d 1267 (Colo.1990).

Originally, the United States Supreme Court applied the takings clause only to physical appropriation of property, but later established the principle that a regulation can effect a taking if it goes too far. *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

Such "regulatory takings" ordinarily are identified by a case-specific factual inquiry which weighs competing public and private interests. *See Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). Nevertheless, regulations which compel owners to suffer physical invasion or occupation of their property or, as recently decided, which deny owners all economically beneficial or productive use of the land, are *ipso facto*, regulatory takings. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (a regulation that renders property devoid of all economically viable use must be considered categorically a compensable taking); *Loretto v. Teleprompter Manhattan CATV*

*Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

■ Also, until recently, a landowner suffering a regulatory "taking" could elect either to attack the validity of the regulation and seek injunctive relief or, alternatively, to seek compensation for inverse condemnation. If the regulation were judicially invalidated, however, compensation was not constitutionally required for the period between the enactment of the regulation and its invalidation. *See Agins v. Tiburon,* 24 Cal.3d 266, 157 Cal.Rptr. 372, 598 P.2d 25 (1979).

In *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (*First English I*), however, the United States Supreme Court determined that invalidation of a regulatory restriction, although converting the taking to a "temporary" one, was not a sufficient remedy to meet the demands of the Just Compensation clause of the Fifth Amendment. The Court therefore held that monetary compensation must be provided for the interim period of compelled compliance with the invalid regulation.

## A.

Williams concedes that no physical taking is implicated here. Based upon the above described principles, however, he claims that, under *Lucas* and *First English I*, a categorical compensable taking occurred because the suspension of special use permit applications deprived him of all economically viable use of the Belvidere Theater during the 10 months the moratorium was in effect. We do not agree.

### 1.

We initially examine, under a traditional takings analysis, Williams' assertion that he has suffered a categorical taking.

■ Generally, to determine whether there has been a denial of all use of a landowner's property, a court must compare the value that has been taken from the property to that which remains; the interference with rights in the discrete segment of the property affected is measured against the value of the property as a whole. *Keystone Bitumi-*

*nous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1986).

#### a.

■ The effect of a regulation which is temporary by design, however, is not measured simply by the value of the property "taken" during the limited time frame in which the regulation was in effect. To the contrary, the determination as to the nature and extent of the interference with the property in its entirety must take into consideration the value the property retains after the moratorium has been lifted. *See Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Woodbury Place Partners v. City of Woodbury,* 492 N.W.2d 258 (Minn.App.1992).

This is because, even if the ability to sell or develop the property is restricted during the moratorium, the landowner is free to continue with sale or development once the regulation is lifted. *See Agins v. City of Tiburon, supra* (when condemnation proceedings are begun, but later abandoned, pre-condemnation activities do not constitute a taking).

Under this analysis, an interim regulation prohibiting construction or development is not a temporary taking even if such restrictions would be held too onerous to survive scrutiny had they been permanently imposed. *First English Evangelical Lutheran Church v. County of Los Angeles,* 210 Cal. App.3d 1353, 258 Cal.Rptr. 893 (1989) (*First English II*). Absent extraordinary delay, fluctuations in value that occur during a temporary moratorium enacted to effect the process of governmental decisionmaking are, simply, incidents of ownership. *See Agins v. City of Tiburon, supra; Woodbury Place Partners v. City of Woodbury, supra.*

■ Thus, a temporary limitation on property use, resulting from the otherwise good faith, reasonable institution of a moratorium in order to bring about effective governmental decisionmaking does not result in a categorical taking.

#### b.

■ Here, Williams' application for a special use permit was suspended temporarily

pending governmental study and decision making concerning the growth accompanying the commencement of limited stakes gambling. As a matter of law, this 10-month delay in the realization of the economic benefits of commercial development of the Belvidere Theater was not extraordinary. *See McCutchan Estates Corp. v. Evansville-Vanderburgh County Airport Authority District,* 580 N.E.2d 339 (Ind.App.1991) (nine-month delay not extraordinary as a matter of law); *see also Dufau v. United States,* 22 Cl.Ct. 156 (1990) *aff'd without opinion,* 940 F.2d 677 (Fed.Cir.1991) (sixteen-month delay not extraordinary as a matter of law); *First English II, supra* (delay of more than two years not unreasonable); *Guinnane v. City & County of San Francisco,* 197 Cal.App.3d 862, 241 Cal.Rptr. 787 (1987) (delay of more than one year not unreasonable as a matter of law); *Woodbury Place Partners v. City of Woodbury, supra* (delay of two years not extraordinary considering state statute permitted interim zoning ordinances for periods of up to thirty months).

Consequently, although we note that the regulation in question permitted special use applications to proceed as to a limited number of other uses during the moratorium, it is immaterial whether, as a factual matter, Williams was deprived of all uses which otherwise were economically viable.

Accepting, as we must, Williams' factual assertions as true, even if all economically viable uses were temporarily barred, we conclude that, under traditional takings principles, the 10-month moratorium did not constitute a categorical compensable taking.

### 2.

Williams argues, however, that under *Lucas* and *First English I, any* temporary regulatory deprivation of all economically viable use of real property constitutes a categorical compensable taking. We do not read these cases so broadly, nor do we agree that these cases have so drastically changed the traditional takings analysis.

### a.

First, contrary to Williams' assertions, neither *First English I* nor *Lucas* reached the issue presented in this case—whether compensation is categorically required for developmental delays caused by regulations which are expressly designed to be temporary.

In *Lucas,* the issue addressed was whether regulatory deprivation of all economically viable use of the property was a categorical taking or whether a case-specific inquiry weighing the public interest advanced by the regulation against the private interests affected was required. The Court held that the taking was categorical and, following the rule of *First English I,* further held that compensation therefore was required because the regulation had been enacted as a permanent measure. Although later amended to allow exceptions by special permit, the regulation had already worked a taking. *Cf. San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting).

Conversely, in *First English I,* the invalidated regulation was subsequently determined on remand to be temporary and, thus, not a regulation which effected a categorical taking. *See First English II, supra; Woodbury Place Partners v. City of Woodbury, supra* (reach of *First English I* extended to retrospectively temporary takings but not to prospectively temporary regulations).

### b.

Secondly, the pivotal factor underlying the respective analyses in *Lucas/First English I* was the intended permanence of the regulations ultimately invalidated. Hence, the rationale of these cases does not extend to the temporary suspension of land use, such as occurred here.

Unlike a temporary physical occupation—which ousts the owner from the property and which requires compensation for doing so—the concept of a regulatory "taking" relies for its very existence to some extent upon the permanent interference with rights in part or all of the property affected. For this reason, rigorous standards of ripeness and finality for purposes of review usually are imposed in regulatory takings cases. *See Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108,

87 L.Ed.2d 126 (1985); *San Diego Gas & Electric Co. v. City of San Diego, supra.*

■ According to *Lucas* and *First English I*, however, if a regulatory restriction, enacted as permanent but ultimately invalidated, worked a total deprivation of all economically viable use of property, then the government must pay for this deprivation.

Ignoring as it does the effect of subsequent events, *e.g.*, repeal of the offending ordinance, this *Lucas/First English I* requirement that the government pay for an interim deprivation is not grounded on any traditional takings formula. Rather than measure the true loss of value of the property, as established takings principles require, the supreme court's requirement that the government pay compensation under these circumstances, in effect, simply punishes the government for its "lawless" behavior in order to discourage future unconstitutional regulation as a matter of public policy. The reasoning is that the threat of financial liability discourages the enactment of an unconstitutional permanent regulation and, instead, encourages government to err "on the constitutional side." *See San Diego Gas & Electric Co. v. City of San Diego, supra* (Brennan, J., dissenting); *see also* F. Michelman, *Takings, 1987*, 88 Colum.L.Rev. 1600 (1988).

In contrast, however, such *Lucas/First English I* policy considerations are irrelevant if, as here, a regulation is enacted as an interim measure.

"Stop-gap" regulations are, by their very nature, of limited duration and are designed to maintain the status quo pending study and governmental decision making. *See State ex rel. SCA Chemical Waste Services, Inc. v. Konigsberg,* 636 S.W.2d 430 (Tenn.1982). Moratoria which function as interim development controls merely suspend the use to which the property may be put while land use control studies are conducted. *Schafer v. City of New Orleans,* 743 F.2d 1086 (5th Cir.1984).

■ Thus, the necessity, based upon public policy considerations to discourage enactment of presumptively permanent regulations which unconstitutionally deprive owners of all economically viable uses of their property is not present when the measure is temporary. For this reason, temporary moratoria consistently are not subject to the same degree of judicial scrutiny as are permanent regulations, *see McCurley v. City of El Reno,* 138 Okl. 92, 280 P. 467 (1929), and generally are upheld so long as the duration is reasonable under the circumstances and the enactment was made in good faith without discrimination. *See State ex rel. SCA Chemical Waste Services, Inc. v. Konigsberg, supra; Anderson v. Pima County,* 27 Ariz. App. 786, 558 P.2d 981 (1976); *Almquist v. Town of Marshan,* 308 Minn. 52, 245 N.W.2d 819 (1976); *CEEED v. California Coastal Zone Conservation Commission,* 43 Cal. App.3d 306, 118 Cal.Rptr. 315 (1974); *see also* Annotation, *Validity and Effect of "Interim" Zoning Ordinance,* 30 A.L.R.3d 1196 (1970).

Importantly, the *Lucas* court specifically noted that categorical temporary takings were expected to be a rare event, occurring only under extraordinary circumstances. "Stop gap" or interim zoning moratoria, however, play an important role in land use planning and are commonly employed. *See Deighton v. City Council,* 902 P.2d 426 (Colo. App.1994); *Dollaghan v. County of Boulder,* 749 P.2d 444 (Colo.App.1987); *Schafer v. City of New Orleans, supra; see also* R. Frielich, *Interim Development Controls: Essential Tools for Implementing Flexible Planning & Zoning,* 49 J.Urban.L. 65 (1971). If we extend the *Lucas* decision, as Williams suggests, to encompass otherwise reasonable temporary regulations, categorical temporary takings would certainly not be "rare" or "extraordinary" occurrences.

■ Thus, we conclude that the *Lucas61First English I* decisions do not alter the established principle that the interim burden imposed on a landowner during the government's decisionmaking process, absent unreasonable · delay, does not constitute a taking. *See McCutchan Estates Corp. v. Evansville–Vanderburgh Airport Authority District, supra.*

## B.

■ Because Central City's temporary moratorium on the processing of special use

permit applications was not a categorical taking, we must next inquire whether compensation is nonetheless required. *See State v. The Mill,* 887 P.2d 993 (Colo.1994); *First English II, supra,* 210 Cal.App.3d at 1373, 258 Cal.Rptr. at 906 ("We do not read the U.S. Supreme Court's decision in *First English [I]* as converting moratoriums and other interim land use restrictions into unconstitutional 'temporary takings' requiring compensation unless, perhaps, if the interim measures are unreasonable in purpose, duration or scope.").

When making such an inquiry, we must consider the character of the challenged governmental action, its economic impact, and the extent to which the regulation has interfered with the reasonable investment-backed expectations of the land owner. *See Penn Central Transportation Co. v. City of New York, supra; Golden Pacific Bancorp v. United States,* 15 F.3d 1066 (Fed.Cir.1994).

■ If the landowner has notice of the extent of the government's regulatory authority over the property, the landowner's reasonable investment-backed expectation is the dispositive factor in the takings analysis. *State v. The Mill, supra.* We conclude that this factor is dispositive here.

When Williams purchased the Belvidere Theater, the area was zoned for commercial use that did not include limited stakes gambling. The state constitutional amendment allowing such activities in Central City had not yet been adopted by the voters of Colorado. Williams does not dispute that limited stakes gambling was the intended ultimate use of the property at the time of the purchase.

Subsequent to the purchase, Central City passed a zoning ordinance under which *all* commercial uses other than parking lots were subject to special review. Williams has not raised any challenges in this action to that ordinance. He challenges only the moratorium which suspended processing of his special use application.

Williams was "on notice" that the intended ultimate use of limited stakes gambling was speculative at best: first, because it had not yet been approved by the voters at the time of the purchase, and secondly, because it was subject to special use review and approval in the discretion of Central City. He was also "on notice" that all other commercial uses were subject to the special review process. Finally, he was "on notice" that the Belvidere Theater was an historic property and that demolition or remodeling would be subject to the authority of the Historic Preservation Commission.

Thus, we must conclude that Williams was aware of what may be atypically heavy regulations affecting the Belvidere Theater and that he could not expect to avoid those regulations. Any expectation that he would expeditiously be granted a special use permit to conduct limited stakes gambling was not a reasonable investment-backed expectation. Hence, we agree with the trial court that the temporary suspension of his permit application, as a matter of law, was not a taking warranting compensation under the Fifth Amendment. *See State v. The Mill, supra.*

## II.

Williams also argues that the trial court erred in determining that his inverse condemnation claim was not ripe. Again, we disagree.

In his complaint, in addition to his claim for damages, Williams claimed that he was entitled to compensation for inverse condemnation because the moratorium had effected a complete or partial taking. He requested the court to empanel a jury of freeholders to determine the reasonable value of the Belvidere Theater according to eminent domain procedures under § 38–1–101, et seq., C.R.S. (1982 Repl.Vol. 16A).

■ An inverse condemnation action for recovery of the value of property taken by the government is based on the takings clause of Colo. Const. art II, § 15; accordingly, such an action is tried as if it were an eminent domain proceeding. *Linnebur v. Public Service Co.,* 716 P.2d 1120 (Colo.1986); *see* § 38–1–101, et seq.

A claim for inverse condemnation may be brought when a property owner contends that government regulation has effected a taking. *See Ossman v. Mountain States*

*Telephone & Telegraph Co.,* 184 Colo. 360, 520 P.2d 738 (1974).

Accordingly, Williams' inverse condemnation claim appears to assert that a permanent taking of the Belvidere Theater has occurred. To that extent, the trial court correctly determined that the inverse condemnation claim is not ripe.

■ A claim for inverse condemnation alleging that the government has executed a permanent regulatory taking is not ripe until a final decision has been made as to the uses to which the property may be put. *Wilkinson v. Board of County Commissioners,* 872 P.2d 1269 (Colo.App.1993); *Reale Investments, Inc. v. City of Colorado Springs,* 856 P.2d 91, 94 (Colo.App.1993) (a "court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes").

Williams does not dispute that the moratorium has been repealed. Neither does he assert that he has been denied a permit to conduct any economically viable activity at the Belvidere Theater. Therefore, his claim for inverse condemnation, to the extent that it is based on a permanent regulatory taking, is not ripe for review. *See Wilkinson v. Board of County Commissioners, supra.*

Furthermore, even if Williams' inverse condemnation claim in some manner also seeks compensation for the period of time the moratorium was in effect and, to that extent, is otherwise ripe, *see Lucas v. South Carolina Coastal Council, supra,* we have determined that no such temporary taking occurred as a matter of law. Thus, for this additional reason, we agree that the trial court properly dismissed Williams' inverse condemnation claim.

The judgment is affirmed.

MARQUEZ and KAPELKE, JJ., concur.